JOHN MILLER SUPPLY COMPANY, INC., Appellant, v. WESTERN STATE BANK, Respondent: WILLOW CREEK MANUFACTURING CORPORATION, Defendant.

*No. 75. Argued June 5, 1972.—Decided June 30, 1972.*
(Also reported in 199 N. W. 2d 161.)

386

388

For the appellant there were briefs by *Whyte, Hirschboeck, Minahan, Harding & Harland, S. C.,* and *Daniel S. Grable* and *Edward J. Heiser, Jr.,* all of Milwaukee, attorneys, and *Victor A. Miller* of St. Nazianz of counsel, and oral argument by *Mr. Heiser.*

For the respondent there was a brief by *Di Renzo & Bomier* and *Jeffrey F. Snyder,* all of Neenah, and oral argument by *Mr. Snyder.*

HANLEY, J. But one issue is presented on this appeal: Did the agreement of March 11, 1966, give the supply company a security interest in the Willow Creek collateral applicable to the contingent contractual liabilities of Willow Creek to the supply company under contracts executed between the parties on that date and thereafter.

It is clear that the supply company intended to make future advances to Willow Creek. It was intended, and the agreement clearly recites, that the collateral would secure any future loans made under the contract. The $5,000 loan made the same day is clearly secured by the collateral.

The agreement, however, contains the further language: "To secure payment of such loans and *all other Obligations*, Debtor grants Bank a security interest in the Collateral." (Emphasis supplied.) "Obligations" is defined to mean: "all Debtor's present and future debts, obligations and liabilities to Bank, of whatever nature."

The plaintiff argues that the definition of "obligations" covers any contractual liability between the parties. The defendant contends that the interpretation placed upon the agreement by the plaintiff would misconstrue the clause and would confer a security interest for transactions not within the contemplation of the parties at the time the agreement was executed.

The defendant, in addition, argues that the security is limited to the amount of $15,000, and then only in respect to loans made prior to January 1, 1967.

The type of security interest agreed to by the supply company and Willow Creek on March 11, 1966, is commonly known as a "floating lien." *See* Helstad, *The Impact of the Uniform Commercial Code on Wisconsin Law,* 1964 Wisconsin Law Review, 355, 394. This security arrangement is specifically sanctioned by the Uniform Commercial Code, sec. 409.204 (5), Stats., which provides:

"Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment."

This provision of the Uniform Commercial Code was designed to encourage the use of "floating liens." *See* Comment 8, sec. 9–204, Uniform Commercial Code. Such "floating liens" are advantageous to both borrower and lender and facilitate the flow of modern commerce. *See* Coogan, *Article 9 of the Uniform Commercial Code,* 72 Harvard Law Review (1958–59), 838, 850; Coogan & Gordon, *The Effect of the Uniform Commercial Code Upon Receivables Financing,* 76 Harvard Law Review (1962–63), 1529, 1549; Comment, *Priority of Future Advances Lending Under the Uniform Commercial Code,* 35 University of Chicago Law Review (1967–68), 128. If a valid "floating lien" arrangement is set up under sec. 409.204 (5), Stats., future advances under the same security agreement are secured as of the time of the perfection of the original security agreement under the "single security interest" concept. Under this theory, although several loans or other value are given by the lender subsequent to the date of perfection of the original security agreement, there is only one security interest and all of the subsequent advances relate back to the original security agreement. As was stated in a leading case:

"The security interest having attached and become perfected with the first advance may thereafter vary as to the amount by partial payment of the loan or by future advances but each such act does not create a new separate security interest." *Friedlander v. Adelphi Mfg. Co., Inc.* (N. Y. Sup. Ct., Queens County, March 13, 1968), 5 U. C. C. Reporting Service 7, 10.

The plaintiff alleges that a claim for future contingent loss or liability *is secured* by a chattel mortgage. *Angers v. Sabatinelli* (1945), 246 Wis. 374, 17 N. W. 2d

282, 18 N. W. 2d 705. The rule of *Angers* is more properly stated: "A mortgage *may* be given for the purpose of indemnifying another against a future and contingent loss or liability." (Emphasis supplied.) *Angers,* page 388.

In *Capocasa v. First Nat. Bank* (1967), 36 Wis. 2d 714, 154 N. W. 2d 271, this court recognized the desirability, in proper circumstances, of security instruments to secure future advances or obligations. We pointed out, however, that such documents would be closely scrutinized and would be enforced only to the extent that the future transactions or liabilities sought to be secured were in the clear contemplation of the parties.

What was contemplated by the parties is, of course, to be determined initially from a reasonable reading of the language of the agreement. Putting aside the termination date of the agreement and the aggregate limit of $15,000, the agreement purports to secure payments of "such loans and all other Obligations."

Plaintiff contends that the definition of obligations encompasses not only loans but "obligations and liabilities of whatever nature." However, from the face of the agreement, there is no evidence that the parties contemplated that the security interest would cover future breaches of sales contracts not directly related to the lending of money. It is even doubtful that a cause of action not reduced to judgment creates a liability except in the most conservative accounting sense. The question in the instant case, however, is whether the obligation, if in fact one now exists, was of the type contemplated by the parties.

2 Gilmore, *Security Interests in Personal Property,* pp. 931, 932, sec. 35.5, discusses the circumstances under which future transactions may be secured under an earlier made agreement. Gilmore states:

"Article 9 puts no express limitation on the validity of future advance arrangements. Section 9–204 (5) provides: 'Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment.' The relevant Comment, after referring to the 'vaguely articulated prejudice against future advance agreements' under prior law, remarks that 'this subsection validates the future advance interest, provided only that the obligation be covered by the security agreement.'

"It is not entirely clear what the phrase 'covered by a [the] security agreement,' which appears in both text and Comment, means. Nor is it clear that the phrase is used in the same sense in its two appearances. The Comment seems to suggest that the phrase is a limitation: any future advance agreement is valid, *provided* that it is somehow 'covered by the security agreement.' The only apparent meaning of the phrase, if it is taken as a limitation, is that there must be a clause in the security agreement which clearly provides for future advances. Absent such a clause, future advances would not be 'covered;' a new loan would require a separate security agreement. Such a limitation would indeed be in line with the pre-Code case law. It is much less clear from the text than it is from the Comment that the phrase is used as a limitation; in the text it could easily be read as merely descriptive, meaning no more than 'any secured obligations.' The reading suggested by the Comment is, however, a plausible construction of the text, even if it is not the only possible one.

"However 'covered by the security agreement' is to be read, sec. 9–204 (5) should certainly not be taken to overrule the so-called 'dragnet' cases under pre-Code law. Legitimate future advance arrangements are validated under the Code, as indeed they generally were under pre-Code law. This useful device can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangement claims against the debtor which are unrelated to the course of financing that was contemplated by the parties. In the dragnet cases, the

courts have regularly curbed such abuses: no matter how the clause is drafted, the future advances, to be covered, must 'be of the same class as the primary obligation . . . and so related to it that the consent of the debtor to its inclusion may be inferred.' The same tests of 'similarity' and 'relatedness,' vague but useful, should be applied to sec. 9–204 (5) ."

In sec. 35.2, page 920, of the same treatise, Gilmore quotes with approval a case originating in Arkansas, *National Bank of Eastern Arkansas v. Blankenship* (E. D. Ark. 1959), 177 Fed. Supp. 667, 673, affirmed, *National Bank of Eastern Arkansas v. General Mills, Inc.* (8th Cir. 1960), 283 Fed. 2d 574:

"The 'other indebtedness' secured by a mortgage may be either antecedent or subsequent. Where it is antecedent it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred."

Gilmore cites this case as a fair summary of the general law prior to the code and concludes that the same rationale should be applied in the interpretation of transactions arising under the code.

Applying these generally accepted rules to the instant case, the liability or obligation asserted in the plaintiff's complaint in its first, third, and fourth causes of action was not within the clear contemplation and intent of the parties in the agreement of March 11, 1966, and the subsequent contingent liabilities are not of the same nature or related to the types of indebtedness involved in the original financing agreement.

We conclude, therefore, that the "loan and security agreement" is insufficient to secure payment for the contractual breaches which the plaintiff alleges.

We have carefully examined the cases relied on by the plaintiff, but in each case they are distinguishable in that they relate to either a similar course of financing

or fall within the expressed intent of the parties. None of the cases stand for the broad proposition advocated by the plaintiff—that in a case where value is given and the agreement contains a "dragnet" clause, the security agreement secures all future contingent contractual liability of the debtor.

A case somewhat analogous to this is the *National Acceptance Co. of America v. Blackford* (5th Cir. 1969), 408 Fed. 2d 20. Therein the secured party claimed an interest in the bankrupt's collateral for indebtedness under a lease agreement for rental of certain equipment. It contended that the agreement was broad enough to cover this situation because its stated purpose was to secure "all indebtedness and liabilities of every kind of *Borrower* to *Lender*, hereinafter owing." The Fifth Circuit refused to stretch the security interest to cover this obligation because rents were not mentioned in the agreement. The court pointed out, at page 23: "Nor does it appear that the rent obligation arising out of the lease was in any other way connected with the factor's lien agreement."

A "floating lien" security agreement will be effective according to its own terms, but only if those terms or the course of dealing of the parties evidence that the real intent of the parties was that their subsequent transactions be covered by the terms of the security agreement. In the instant case, there is nothing to show that the parties ever intended that their security agreement would apply to future contingent liability on executory contracts between the parties and which were not similar and not related directly to the transaction set forth in the original security agreement.

*By the Court.*—Order affirmed.