BANK OF BARRON, Plaintiff-Respondent,

v.

Arthur H. GIESEKE, a/k/a Arthur Gieseke and Ellen G. Gieseke, Defendants,

Lyle UFER, Gladys Ufer, Robert Gieseke and Lorraine Gieseke, Defendants-Appellants.

Court of Appeals

*No. 91-2527. Oral argument April 24, 1992.—Decided May 12, 1992.*

(Also reported in 485 N.W.2d 426.)

438

440

442

443

444

On behalf of the defendants-appellants, the cause was submitted on the briefs and oral argument of *Peter F. Herrell* of *Wiley, Wahl, Colbert, Norseng, Cray and Herrell, S.C.* of Eau Claire.

On behalf of the plaintiff-respondent, the cause was submitted on the brief and oral argument of *Gregory A. Jennings* of *Gregory A. Jennings Law Offices* of Chetek.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.    Lyle and Gladys Ufer and Robert and Lorraine Gieseke (collectively "the Ufers") appeal a judgment of foreclosure in favor of the Bank of Barron. The trial court found that Arthur and Ellen Gieseke's (the debtors) notes to Barron were secured by a 1979 Consumer Real Estate Security Agreement (CRESA) covering the debtors' real property, and, therefore, the notes had priority over the Ufers' 1986 mortgages in the debtors' real property. The Ufers argue that: (1) The trial court erred by finding that the CRESA was valid;

(2) The CRESA does not apply to the notes that failed to specify that they were secured by the CRESA; (3) The CRESA only applies to future transactions subject to the Wisconsin Consumer Act (WCA), chs. 421 to 427, Stats.; (4) Barron was not entitled to subrogation to the land contract; and (5) equity favors finding that the Ufers' mortgages had priority over Barron's notes.

We conclude that the CRESA is valid and applies to three of the notes to Barron. Those three notes ($4,100, $8,100 and $15,000) have priority over the Ufers' mortgages. We also conclude, with respect to the remaining two notes, that one ($68,000) is entitled to priority under the theory of subrogation, and the other ($104,611.07) is subordinate to the Ufers' mortgages. The judgment is affirmed in part and reversed in part.

The debtors purchased their property under a land contract dated January 15, 1979, and recorded January 17, 1979. Also on January 17, 1979, Barron and the debtors executed a CRESA that was recorded on January 22, 1979. It granted Barron a continuing lien on the debtors' real property as security for credit granted in the future. The CRESA also provided that the debtors agreed not to mortgage all or part of the property. Between November 9, 1982, and February 8, 1989, Barron made thirty-six advances to the debtors. Only five of those advances were outstanding at the time of the debtors' foreclosure and are the basis for this action. The five advances were granted after April 4, 1986, the date that the Ufers recorded mortgages on the debtors' real property as security for money lent to the debtors.

Of the five outstanding advances, the first was granted in the amount of $4,100 on June 1, 1987. The note indicated that it was governed by the WCA and stated that "[t]his note is secured (to the extent not prohibited by the Wisconsin Consumer Act) by all

existing and future security agreements between Bank and Maker . . .." However, the space provided following the statement "This Note is also secured by a real estate ———," was left blank.

The second advance in the amount of $8,100 was dated July 28, 1988. This note also indicated that it was governed by the WCA and contained the same language explaining that it was secured, to the extent not prohibited by the WCA, by all existing security agreements. In the space provided, the note stated that it was also secured by a real estate security agreement dated January 17, 1979, from the debtors to Barron.

On January 16, 1989, Barron advanced $68,000 to the debtors and they, again, issued a note to Barron. Barron also executed and recorded a mortgage on the debtors' property as security for the note (1989 mortgage). The note was silent as to whether the transaction was governed by the WCA, but it indicated that it was secured by real estate under an agreement dated January 16, 1989 (the 1989 mortgage), and "also secured (to the extent no prohibited [sic] by the Wisconsin Consumer Act) by all existing and future security agreements covering personal property . . .." The $68,000 advance was issued in part to pay off the debtors' 1979 land contract.

The fourth advance was dated January 20, 1989, and was for $104,611.07. This note indicated that the WCA did not apply, and it contained the same language as the $4,100 and $8,100 notes with respect to being secured by all existing security agreements to the extent not prohibited by the WCA. On the blank line provided, the note indicated that it was also secured by "a real estate RESA & Mortgage dated 1–17–79 & 1–16–89 from [debtors] to Lender." Further, the $104,611.07 note renewed and reamortized a note dated July 14, 1986. The

448

1986 note also indicated that it was not governed by the WCA.

The final advance of $15,000 was dated February 8, 1989. The note evidencing this advance stated that it was governed by the WCA; contained the same language as the $4,100, $8,100 and $104,611.07 notes about being secured by all existing security agreements to the extent not prohibited by the WCA; and left blank the line providing "[t]his Note is also secured by a real estate ———. . . ." It renewed a note dated December 30, 1988. The 1988 note indicated that it was subject to the WCA.

Barron first obtained a title abstract for the debtors' property after it disbursed the $68,000 advance, issued in part to pay off the debtors' land contract debt. Barron received the abstract in February 1989, which disclosed the Ufers' 1986 mortgages on the debtors' property. Barron then asked the Ufers to sign subordination agreements, but they refused.

By April 1989, the debtors had filed for reorganization under ch. 11 of the United States Bankruptcy code, 11 U.S.C. §§ 1101–1179 (1979), which was later changed to liquidation under ch. 7, 11 U.S.C. §§ 701–766 (1979). On April 24, 1990, Barron commenced a foreclosure action alleging that the Ufers' mortgages were subordinate to Barron's notes. The trial court found that the 1979 CRESA was valid and covered all future transactions, and, therefore, Barron's five notes were secured by the CRESA and had priority over the Ufers' 1986 mortgages.

## VALIDITY OF THE CRESA

We first address the Ufers' argument that the trial court erred by finding that the CRESA was valid. The Ufers contend that the original 1979 debt, secured by the

CRESA, was paid prior to November 9, 1982, the date of the first of thirty-six advances by Barron to the debtors. Therefore, they claim that the CRESA was satisfied by operation of law and no longer valid because once a debt is paid, the lien securing the debt is extinguished.

Whether the original debt was paid is a question of fact. This court will not set aside the trial court's findings of fact unless they are clearly erroneous. Section 805.17(2), Stats.

The parties disagree whether the original 1979 debt ever showed a zero balance. The trial court concluded that Barron had a continuous business relationship of renewal, extension and consolidation of loans with the debtors from 1979 to 1989. It further concluded that Barron had a continuing lending interest in the debtors' real estate and no release of the CRESA was ever given. Thus, the trial court found that there was never a zero balance on the debtors' accounts and that the original debt was never paid in full prior to the first of Barron's many future advances to the debtors.

The trial court's conclusion is supported by the evidence. Robert Peterson, president of Barron and the person who granted the original 1979 loan to the debtors, testified at trial that there was never a zero balance on the debtors' account between January 17, 1979, and the debtors' bankruptcy. The documents in evidence supported Peterson's testimony that there was a continuing lending relationship between Barron and the debtors, and that the debtors never paid off the original 1979 loan prior to receiving any subsequent credit. The only evidence to the contrary was an exhibit, presented by the Ufers, that showed a zero balance on April 13, 1982. The trial transcript, however, indicates that there was no

testimony explaining what the exhibit and "zero" entry referred to. Consequently, the Ufers failed to prove that the debtors had paid off the original 1979 debt prior to the debtors receiving any subsequent credit. Based on the evidence, we conclude that the trial court's finding that the CRESA was valid is not clearly erroneous.

## FUTURE NOTES' REFERENCES TO THE CRESA

The Ufers also argue that the CRESA does not apply to the notes that failed to specify such notes were secured by the CRESA. They contend that the $4,100 and $15,000 notes, issued June 1, 1987, and February 8, 1989, respectively, are not secured by the CRESA because those notes failed to refer to the CRESA in the blank space provided following the statement "[t]his note is also secured by a real estate ————. . . ."

Whether a note must refer to the document providing a security interest for the note where the document covers future advances is a question of law. We review questions of law without deference to the trial court. *Ondrasek v. Tenneson,* 158 Wis. 2d 690, 694, 462 N.W.2d 915, 917 (Ct. App. 1990).

A security agreement does not attach unless the debtors signed the agreement, the agreement contains a description of the collateral, value has been given and the debtor has rights in the collateral. Section 409.203(1), Stats. Obligations covered by a security agreement may include future advances, regardless of whether the secured party is bound to make the advances. Sections 409.204(3) and 409.105(1)(k), Stats. The debtors signed the CRESA, which contains a description of the debtors' property. Barron issued

451

money to the debtors at the time the CRESA was entered into and the debtors had rights in their property pursuant to a land contract. Thus, the CRESA did attach to the debtors' property. Furthermore, the CRESA unambiguously provides a security interest for credit granted in the future from Barron to the debtors, at the debtors' request and/or Barron's option.

A real estate security agreement that gives a bank "a continuing lien on the Property to secure all . . . future debts, obligations, interest and liabilities . . . to Bank" is sufficient to cover future advances, and it attaches to future notes even though the notes do not refer to the real estate security agreement. *See State Bank of Hartland v. Arndt,* 129 Wis. 2d 411, 421–422, 385 N.W.2d 219, 224 (Ct. App. 1986). Under the CRESA, the debtors gave Barron a continuing lien on their property as security for all debts, obligations and liabilities arising out of credit granted in the future, to induce Barron to extend credit in the future in any manner or amount at Barron's option and/or at their request. Based on its language, the CRESA covered all future credit granted in relation to the debtors' farming operations. The CRESA's applicability to the future advances did not depend upon whether the future notes referred to the 1979 CRESA. Thus, we conclude that the CRESA covers the $4,100 and $15,000 advances issued by Barron to the debtors, even though those notes failed to indicate that they were secured by the CRESA.

## SCOPE OF THE CRESA

The Ufers next argue that the CRESA only covers future advances in maximum amounts of $25,000. This

issue depends upon the interpretation of the CRESA. The 1979 CRESA provides in relevant part:

> To induce Bank of Barron ("Lender") to extend credit at any time in any manner or amount . . . to . . . the undersigned or at their request . . . the undersigned ("Customer" . . .) jointly and severally:
>
> . . ..
>
> Grants Lender a continuing lien on the Property to secure all debts, obligations and liabilities of any Customer to Lender arising out of . . . credit granted in the future by Lender to any Customer . . . except credit in an original amount of less than $1000.00, the granting of which is subject to the Wisconsin Consumer Act ("Obligations").

The Ufers contend that the clause "the granting of which is subject to the Wisconsin Consumer Act" (the granting clause) modifies "credit granted in the future . . .." They base their construction on the use of the commas that set off the $1,000 exception. The Ufers claim that under this interpretation, the 1979 CRESA would not grant Barron a lien on future advances in an amount exceeding $25,000 because the WCA excludes consumer credit transactions where the financed amount exceeds $25,000. Section 421.202(6), Stats. They also base their claim on the fact that the CRESA is subtitled "(Loans to individuals for personal, family, household or agricultural purposes where amount financed is $25,000 or less.)." Thus, the Ufers argue that their mortgages have priority over Barron's $68,000 and $104,611.07 notes, issued on January 16 and 20, 1989, respectively, because those notes exceed $25,000.

Barron argues that the granting clause modifies "except credit in an original amount of less than $1000.00." It contends that the clause merely refers to

453

sec. 422.417(3)(b), Stats., which states that a lender may not take a security interest, unless it is a purchase money security interest, in real property if the obligation secured is less than $1,000. Thus, Barron argues that the CRESA secures its $68,000 and $104,611.07 advances issued to the debtors.

Alternatively, Barron argues that the CRESA secures its $68,000 and $104,611.07 notes because the granting clause modifies "credit granted in the future . . .." Barron contends that under this construction, the granting clause allows it to "opt in" to the WCA for all credit granted in the future exceeding $25,000. Under this interpretation, Barron agreed to provide WCA protections to the debtors for all future advances regardless of whether the credit was more or less than $25,000. Because the original 1979 loan was under $25,000, Barron argues that it had no choice but to use the form for loans of $25,000 or less. Barron claims that the CRESA's subtitle and the granting clause do not limit the coverage of the CRESA to future advances of $25,000, maximum.

The trial court specifically found that the CRESA applied to all future transactions, and the fact that the form used for the CRESA was the form preferred for financed amounts of $25,000 or less did not limit future advances under the agreement to amounts under $25,001. Thus, the trial court rejected the Ufers' argument that the CRESA could only secure future credit granted in an amount of $25,000 or less. In doing so, the trial court found that the CRESA was unambiguous, and the granting clause merely provided that all future advances would be secured by the CRESA if subject to the WCA by statute or by Barron opting in to the WCA.

The interpretation and construction of a contract is a question of law that we review without deference to the

trial court. *Borchardt v. Wilk,* 156 Wis. 2d 420, 427, 456 N.W.2d 653, 656 (Ct. App. 1990). The cornerstone of contract interpretation is to ascertain the parties' true intentions as expressed by the contractual language. *State ex rel. Journal/Sentinel, Inc. v. Pleva,* 155 Wis. 2d 704, 711, 456 N.W.2d 359, 362 (1990). The purpose of judicial construction is to determine what the parties contracted to do as evidenced by the language they used. *Id.* Where the terms of a contract are plain and unambiguous, we construe the contract as it stands. *Borchardt,* 156 Wis. 2d at 427, 456 N.W.2d at 656. Whether a contract is ambiguous is a question of law that we review de novo. *Spencer v. Spencer,* 140 Wis. 2d 447, 450, 410 N.W.2d 629, 630 (Ct. App. 1987).

Wisconsin has long recognized that a security agreement can secure future advances, and the lien will attach at the time of the security agreement even though the advances are made in the future. *Capocasa v. First Nat'l Bank,* 36 Wis. 2d 714, 719, 154 N.W.2d 271, 274 (1967). Future advance provisions, however, will be enforced only to the extent that the future transactions or liabilities sought to be secured were in the contemplation of the parties as evidenced by the language of the agreement. *John Miller Supply Co. v. Western State Bank,* 55 Wis. 2d 385, 392, 199 N.W.2d 161, 164 (1972).

Both the individual amount of each future advance and the aggregate amount of all future advances are unlimited and within the discretion of the parties unless the agreement specifically provides otherwise. Additionally, we agree with the trial court that a lender may opt in to the WCA. The WCA protects consumers against unfair, deceptive, false, misleading and unconscionable practices by lenders. *See* sec. 421.102(2)(b), Stats. When

a transaction falls within the purview of the WCA, the WCA requires the lender to provide specific information to the borrower concerning the consumer credit transaction. *See* sec. 422.301 through 422.308, Stats. Consumer credit transactions of $25,000 or less automatically fall within the WCA and are subject to WCA requirements. Section 421.202(6), Stats.

There is nothing in the WCA, specifically ch. 422, Stats., governing consumer credit transactions, that would prevent a lender from opting in to the WCA for consumer credit granted in an amount greater than $25,000. If the lender opts in, it has to meet the requirements of the WCA and provide the same information to the borrower as if the loan was $25,000 or less. Because the WCA protects borrowers, we see no reason to prevent lenders from affording borrowers the WCA protections when, although not required to do so by the WCA, they agree to do so.

The next issue is whether the CRESA is, by its language, limited to coverage of only future advances under $25,001 individually, and/or as an aggregate amount. A security agreement containing a future advance clause will be effective according to its own terms if those terms or the course of the parties' dealings evidence that the parties' real intent was that their subsequent transactions be covered by the terms of the security agreement. *John Miller Supply,* 55 Wis. 2d at 395, 199 N.W.2d at 165.

In paragraph two of the CRESA, the debtors agreed to grant Barron a continuing lien on their property to secure their debts, obligations and liabilities arising out of credit granted in the future, except credit granted in

an amount less than $1,000, the granting of which is subject to the WCA. We conclude that the granting clause unambiguously modifies credit granted in the future. The exception for credit granted in an amount less than $1,000 merely indicates that Barron's lien on the debtors' property could not secure future advances in an amount less than $1,000. The plain language of the agreement indicates that Barron and the debtors agreed the CRESA would secure all future advances greater than $1,000 that would be subject to, or would fall within the purview of, the WCA automatically by statute or because they agreed to opt in to the WCA. Therefore, the granting clause does not limit individual or total future advances to maximum amounts of $25,000.

We also conclude that the subtitle of the CRESA does not limit the future advances to $25,000 or less, individually or as a maximum. The agreement does not specifically provide that future advances would be limited to $25,000 or less. Although Barron used this form because the original 1979 loan was less than $25,000, its language and subtitle do not limit the future advances to $25,000 or less.

In *In re Ingersoll,* 8 Bankr. 912 (W.D. Wis. 1981), a bankruptcy court reached the same conclusion based on the identical language in a consumer real estate security agreement. The bankruptcy court held that although the real estate security agreement contained the subtitle "(Loans to individuals for personal, family, household or agricultural purposes where amount financed is $25,000 or less.)," the agreement was not limited to securing advances in the individual or aggregate amount of $25,000 or less. *Id.* at 917–18.

The Ufers contend that they interpreted the CRESA as securing only future advances of $25,000 or less. We conclude that the unambiguous language of the CRESA does not support the Ufers' interpretation. Furthermore, we note that a third party's interpretation of a document does not affect the construction of the document. The cornerstone of contract construction is to ascertain the true intentions of the parties to the contract as expressed by the contractual language. *Journal/Sentinel,* 155 Wis. 2d at 711, 456 N.W.2d at 362. Moreover, the Ufers were aware of the CRESA, and, therefore, put on notice as to the agreement's terms. The fact that they interpreted the terms differently than the parties intended does not change the intended effect and purpose of the agreement. A third party takes notice of the agreement as it is, not as the third party believes it to be. Thus, the CRESA's interpretation is unchanged by the Ufers' beliefs.

Based on the unambiguous and plain meaning of the CRESA, we conclude that the granting clause modifies credit granted in the future, and that it allowed Barron to opt in to the WCA for all future advances. We also conclude that the granting clause and the subtitle of the CRESA do not limit individual or aggregate future advances to $25,000. Thus, the CRESA secured all future advances that were subject to the WCA by statute or by agreement when the amount of the advance exceeded $25,000.

Because the CRESA allowed Barron to opt in to the WCA for future advances over $25,000, we next address whether Barron's $104,611.07 advance is covered by the CRESA. The $104,611.07 note specifically provided that

"This note is not governed by the Wisconsin Consumer Act." The parties' intent is evidenced by the contractual language. *Journal/Sentinel,* 155 Wis. 2d at 711, 456 N.W.2d at 362. The contractual language clearly indicates that Barron and the debtors intended that the $104,611.07 advance would not be governed by the WCA. Consequently, because the $104,611.07 advance was not subject to the WCA by the parties' own volition, we conclude that the parties did not exercise their option to opt in to the WCA and obtain the priority of the CRESA, which is limited to WCA transactions. Therefore, the $104,611.07 note does not relate back to the 1979 CRESA priority date.

██

Also, we recognize that the $104,611.07 advance renewed and reamortized a note dated July 14, 1986. The July 14, 1986 note exceeded $25,000, specifically indicated it would not be governed by the WCA and does not indicate that it renewed or reamortized an earlier note. A new note that consolidates or renews an old note does not extinguish the original lien absent evidence of the parties' intent to do so. *Marine Bank Appleton v. Hietpas, Inc.,* 149 Wis. 2d 587, 592, 439 N.W.2d 604, 606 (Ct. App. 1989). Under *Hietpas,* the $104,611.07 note dates back to the position of the loan it replaced. *Id.* at 592–93, 439 N.W.2d at 606. However, because the Ufers' mortgages were recorded on April 4, 1986, prior to the July 14, 1986 note, the mortgages have a higher priority than the $104,611.07 note. Because Barron's $104,611.07 advance does not relate back to the 1979 CRESA and the note it renewed was subsequent to the priority date of the Ufers' mortgages, we conclude that the $104,611.07 advance is subordinate to the Ufers' mortgages.

Next, we address the priority of Barron's $68,000 advance. We need not decide whether the debtors and

Barron opted in to the WCA with respect to its $68,000 note because that note is entitled to priority over the Ufers' mortgages on the basis of subrogation. Barron argues that the $68,000 advance, secured by a 1989 mortgage, is entitled to conventional subrogation to the position of priority held by the land contract under *Rock River Lumber Corp. v. Universal Mtg. Corp.*, 82 Wis. 2d 235, 262 N.W.2d 114 (1978). It contends that because the $68,000 was used, in part, to pay off the January 15, 1979 land contract, the $68,000 note and mortgage are entitled to the priority position of the land contract. We agree.

In *Rock River,* the owner of property issued a mortgage to a savings and loan association, and the savings and loan recorded the mortgage. *Id.* at 238, 262 N.W.2d at 115. Subsequently, a contractor began visible construction of five homes on the property, giving rise to a construction lien. *Id.* at 239, 262 N.W.2d at 116. Thereafter, the owner obtained a loan from a mortgage corporation that secured the loan by taking a mortgage on the property. *Id.* The loan from the mortgage corporation was used in part to pay off the savings and loan debt. *Id.* First, the supreme court concluded that the corporation's mortgage was intended to be a first mortgage and to discharge the existing savings and loan mortgage. Second, it held that subrogation was equitable because it did not cut off any intervening rights of one relying on the extinguishment of the savings and loan mortgage. Therefore, it concluded that under subrogation, the mortgage corporation was entitled to the savings and loan's priority position. *Id.* at 243–47, 262 N.W.2d at 118–20.

Here, the $68,000 note indicates that it was issued, in part, to pay off the debtors' land contract.[1] Thus, the

[1]We recognize that the $68,000 advance was used in part to pay the debtors' land contract. In *Rock River,* the mortgage cor-

note clearly evidences the parties' intent that the $68,000 be used to discharge the existing land contract debt. The mortgage provides that Barron was subrogated to the lien discharged by the proceeds of the $68,000 note, and that the property was not subject to or encumbered by any prior lien. The language of the mortgage therefore illustrates the parties' intent that the 1989 mortgage, securing Barron's $68,000 advance, be a first mortgage.

The Ufers were aware of the land contract, and knew that their mortgages were subordinate to the land contract. Furthermore, their mortgages were filed prior to Barron issuing the $68,000 advance to the debtors, which extinguished the land contract. Thus, the Ufers did not rely on the extinguishment of the land contract when receiving their mortgages, and their rights remained unchanged because they were always subordinate to the land contract. Because Barron and the debtors intended that the $68,000 advance would discharge the land contract debt and have the position of first priority, and the Ufers' rights remain unchanged, we conclude that Barron's $68,000 note is subrogated to the land contract's position of priority. Therefore, Barron's $68,000 advance has priority over the Ufers' mortgages.

poration's loan was used, "almost in its entirety," to pay the prior lien. *Id.* at 239, 262 N.W.2d at 116. Because the Ufers do not argue that if we accept the bank's position, only the portion of the $68,000 advance that was used to pay the land contract should be entitled to subrogation, we do not address this issue.

In summary, Barron's $104,611.07 note is subordinate to the Ufers' mortgages, and the $68,000 note is entitled to priority under the theory of subrogation. Additionally, the CRESA is valid and covers Barron's $4,100, $8,100 and $15,000 notes. We next decide which, if any, of these three notes ($4,100; $8,100; $15,000) that fall within the purview of the CRESA have priority over the Ufers' mortgages. The priority of optional future advances made pursuant to a security agreement, in relation to mortgages filed before the advances but after the security agreement, is a question of law that we review de novo. *See Colonial Bank v. Marine Bank, N.A.,* 152 Wis. 2d 444, 447, 448 N.W.2d 659, 660 (1989).

In *Colonial,* Colonial obtained a mortgage on the debtor's property in 1977. *Id.* at 446, 448 N.W.2d at 659. That mortgage contained a future advance clause. *Id.* at 446, 448 N.W.2d at 659–60. Marine Bank obtained a mortgage on the debtor's property in 1979. *Id.* at 446, 448 N.W.2d at 660. In 1985, when Colonial granted a future loan to the debtors, it obtained actual knowledge of Marine Bank's mortgage. *Id.* Colonial requested and obtained a subordination agreement from Marine Bank, allowing Colonial to retain its priority status for the 1985 loan. *Id.* In 1986, Colonial granted the debtor two additional loans. *Id.* at 447, 448 N.W.2d at 660. The priority of the two 1986 loans was the subject of the litigation. *Id.*

The supreme court held that if the first mortgagee is contractually obligated to make the future advance, the advance takes its priority from the original mortgage. *Id.* at 449, 448 N.W.2d at 661. The supreme court also concluded, however, that if the future advance under the

original security agreement is optional and the first mortgagee has actual knowledge of an intervening mortgage, the intervening mortgage takes priority over the optional future advance. *Id.* at 449–50, 448 N.W.2d at 661.

The facts in this case are very similar to the facts in *Colonial.* Here, Barron obtained a security agreement in 1979, which covered the debtors' property and contained a future advance clause. In 1986, the Ufers obtained and filed mortgages on the debtors' property. Barron obtained actual knowledge of the Ufers' mortgages in 1989, after it had advanced $4,100, $8,100 and $68,000 to the debtors. Barron then attempted to get the Ufers to sign subordination agreements, but they refused. Subsequently, Barron advanced $104,611.07 and $15,000 to the debtors.

Barron's future advances to the debtors were optional. The CRESA secured "credit granted in the future." It did not require Barron to grant future credit, nor did it require future credit in specified amounts upon the happening of certain events. Although the Ufers' mortgages were recorded in 1986, Barron did not have actual knowledge of their mortgages until 1989. Barron advanced $4,100 and $8,100 prior to obtaining actual knowledge of the Ufers' mortgages. It advanced $15,000 after it had that actual knowledge.

The Ufers argue that "actual knowledge" is something less than real knowledge, and can be found where the facts are sufficient to cause a party to investigate further. We note that the supreme court was well aware of the difference between actual and constructive knowledge when it rendered its decision in *Colonial.* Had the supreme court wanted to require something less than actual knowledge, it would have said so. Consequently,

"actual knowledge" means real knowledge, and it is a requirement that cannot be satisfied with constructive knowledge. Thus, under *Colonial,* we conclude that Barron's $4,100 and $8,100 advances take priority over the Ufers' mortgages.

We next address whether the Ufers' mortgages take priority over Barron's $15,000 advance because Barron had actual knowledge of the Ufers' mortgages when it issued this sum. In *Colonial,* the future advances given to the debtor were unrelated to any prior debt. We conclude that the actual notice exception of *Colonial* does not apply where the future advances renew or reamortize existing debt. Concluding that *Colonial* applies to loan renewals and reamortizations would defeat the purpose of such banking practices because each time a bank renewed or reamortized an existing note, it would lose priority to intervening liens of which it had actual notice.

It is a well-accepted rule that a new note that consolidates or renews an old note does not extinguish the original lien absent evidence of the parties' intent to do so or of paramount equities that would require that result. *Hietpas,* 149 Wis. 2d at 592, 439 N.W.2d at 606. The debtors' $15,000 note renewed their note dated December 30, 1988, prior to Barron's receiving actual knowledge of the Ufers' mortgages. Under *Hietpas,* the $15,000 note dates back to the position of the loan it replaced. *Id.* at 592–93, 439 N.W.2d at 606. We conclude that *Colonial* does not apply to subordinate Barron's $15,000 advance. This advance, although issued after Barron had actual notice, renewed a note that was issued prior to Barron receiving actual notice of the Ufers' mortgages. Also, the $15,000 note contained no language

that evidenced an intent to extinguish the original lien, and, therefore, dates back to the loan it renewed. Consequently, under *Hietpas,* Barron's $15,000 advance also has priority over the Ufers' mortgages.

## EQUITY

Finally, the Ufers argue that under the principles of equity, their mortgages are entitled to priority over all five notes. They base their claim on the facts that Barron did not obtain a title opinion until after it issued the $68,000 advance and then attempted to have the Ufers subordinate their mortgages to its notes. We are not persuaded.

The Ufers had actual knowledge of the 1979 CRESA. They were aware that under the agreement, Barron was allowed to grant future credit to the debtors and the debtors agreed not to mortgage their property to another, including the Ufers. Yet, the Ufers obtained mortgages from the debtors without informing Barron. Furthermore, because the Ufers were aware of the future advance clause, they had notice that their claims would be subordinate to any liens falling within the purview of the 1979 CRESA. Under these circumstances, the Ufers are not entitled to priority over Barron's notes on the basis of equity.

*By the Court.*—Judgment affirmed in part and reversed in part. No costs to either party.