**In re Terry W. & Patti A. JAMES, Debtors.**

**Terry W. & Patti A. JAMES, Plaintiffs,**

v.

**BLACKHAWK CREDIT UNION, Defendant.**

**Bankruptcy No. 97–35683–13.**
**Adversary No. 98–3007–13.**

United States Bankruptcy Court, W.D. Wisconsin.

June 5, 1998.

Ms. Catherine J. Gloeckler, UAW–GM Legal Services, Janesville, WI, for plaintiff.

Mr. Scott F. Shadel, Nowlan & Mouat, Janesville, WI, for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Terry and Patti James (the "James") filed a chapter 13 petition on November 24, 1997 and filed this adversary proceeding on January 13, 1998 to determine the validity of a security interest claimed by Blackhawk Credit Union ("Blackhawk"). A trial was held on May 5, 1998.

Blackhawk filed a claim for $3,159 incurred by the use of the James' Visa credit card and secured by the James' Chevrolet Lumina. Blackhawk claims to be secured by virtue of "dragnet" clauses in its credit card regulations and the security agreement the James had executed at the time they purchased the car. The first line of text in the security

agreement (Def.Exh.2) provides that the security interest is "to secure ... all of any Debtor's present and future debts, obligations and liabilities of whatever nature" to Blackhawk. Blackhawk's credit card regulations (Def.Exh.5) provide that credit card debts will be secured by all collateral held by Blackhawk for other loans when the credit card balance exceeds $1,000. Blackhawk's regulations were mailed as a matter of course to all credit card recipients with their cards. Mr. James claimed that he did not remember ever seeing the regulations, but I find it more likely than not that they were delivered to him. Use of the credit cards was not conditioned upon acceptance of the terms of the regulations.

While there was an outstanding balance on the car loan, the James filed two separate credit card applications with Blackhawk. The first application (for new cards) had the $1,000 credit limit box checked and scratched out. The $1,500 credit limit box was also checked. The "Office Use Only" section of the first application indicates that the application was approved for $1,500. The second application sought to increase the credit limit to $2,500. The "Office Use Only" section gives no indication of whether this was approved.

A separate secured claim for the balance of the car loan was filed for $3,483.70. Blackhawk's perfected interest in the Lumina is sufficient to fully secure both the car debt and the credit card debt.

The James contend, and Blackhawk does not dispute, that they were never orally advised by Blackhawk that their credit card debt would be secured by the Lumina, that they did not fully read the security agreement prior to signing it, and that they either did not know of or did not fully understand the "dragnet" clauses which cause the credit card debt to be secured by the car.

The parties agree that Article 9 of the Uniform Commercial Code governs this dispute. Other than providing for the general validity of dragnet clauses,[1] Article 9 does

---

1. Wis.Stat.Ann. § 409.204(3) provides:
   Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment (s.409.105(1)).

not speak specifically to the issue in this case. The full dragnet clause in Blackhawk's security agreement provides (emphasis added):

> The undersigned ("Debtor", whether one or more) grants to Blackhawk Credit Union ("Secured Party") a security interest in the property described in Section 2 ("Collateral") *to secure,* except as prohibited by the Wisconsin Consumer Act, *all of any Debtor's present and future debts, obligations and liabilities of whatever nature to Secured Party* ("Obligations".)

Chief Judge Posner considered the validity of a similar clause under Wisconsin law in *In re Kazmierczak,* 24 F.3d 1020 (7th Cir.1994). Chief Judge Posner noted that dragnet clauses are valid under Wisconsin law, but also stated that:

> Wisconsin ... is one of the states that in order to prevent the abuse of the dragnet clause requires 'relatedness,' so we must bow and inquire whether the future debt in this case, which arose from the debtors' 1992 purchase of chemicals and fertilizers, was related to their original debt, which arose from their 1991 purchase of chemicals and fertilizers; for it is the 1991 security agreement on which [the creditor] relies. Obviously the 1992 purchase was related to the 1991 one.

*Id.* at 1022.

Whether Wisconsin law requires "relatedness" in all circumstances as Chief Judge Posner stated is questionable. The only case cited by Chief Judge Posner for the relatedness requirement under Article 9 was *John Miller Supply Co. v. Western State Bank,* 55 Wis.2d 385, 199 N.W.2d 161 (1972). The court in *John Miller Supply* stated that "documents [with dragnet clauses] would be closely scrutinized and would be enforced only to the extent that the future transactions or liabilities sought to be secured were in the clear contemplation of the parties." *Id.* at 392, 199 N.W.2d 161. The court then discussed what it meant by the "clear contemplation of the parties":

> What was contemplated by the parties is, of course, to be determined initially from a reasonable reading of the language of the agreement.

*Id.* The court decided that under the facts of the case before it, "there [was] no evidence that the parties contemplated that the security interest would cover [the types of debts in question.]" *Id.*

The court then discussed pre-Uniform Commercial Code law, and decided that a debt which would be secured by a dragnet clause "must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred." *Id.* at 394, 199 N.W.2d 161 (quoting 2 Gilmore, Security Interests in Personal Property, sec. 35.2, p. 920). It should be noted, however, that the court undertook this inquiry only after it had decided that the debt in question did not fit within the express language of the agreement. In summarizing its decision, the court stated that (emphasis added):

> We have carefully examined the cases relied on by the plaintiff, but in each case they are distinguishable in that they relate to either a similar course of financing *or* fall within the expressed intent of the parties.

*Id.* at 394–95, 199 N.W.2d 161. Further reinforcing the implication that it had undertaken a two-part inquiry, the court stated that (emphasis added):

> Applying these generally accepted rules to the instant case, the liability or obligation asserted in the plaintiff's complaint ... was not within the clear contemplation and intent of the parties in the agreement of March 11, 1966 *and* the subsequent contingent liabilities are not of the same nature or related to the types of indebtedness involved in the original financing agreement.

*Id.* at 394, 199 N.W.2d 161.

Wisconsin courts of appeals have also implicitly recognized that Wisconsin law uses a two-part inquiry when examining a dragnet clause. For instance, in *Bank of Barron v. Gieseke,* 169 Wis.2d 437, 455, 485 N.W.2d 426 (Ct.App.1992), the court stated that (some citations omitted):

> The purpose of judicial construction is to determine what the parties contracted to do as evidenced by the language they used

... Where the terms of a contract are plain and unambiguous, we construe the contract as it stands.... Wisconsin has long recognized that a security agreement can secure future advances, and the lien will attach at the time of the security agreement even though the advances are made in the future.... Future advance provisions, however, will be enforced only to the extent that the future transactions or liabilities sought to be secured were in the contemplation of the parties as evidenced by the language of the agreement. *John Miller Supply Co. v. Western State Bank*, 55 Wis.2d 385, 392, 199 N.W.2d 161, 164 (1972).

The court did not specifically mention "relatedness," but may have assumed that it was present due to the similar nature of the transactions between the parties. *See id.* at 447–49, 485 N.W.2d 426 (describing the various advances which were claimed to be secured by the initial security agreement). In addition, *Gieseke* dealt with a real estate security agreement. However, the court in *Gieseke* cited the *John Miller Supply* case and another Wisconsin court has recognized that the nature of the security is not particularly relevant in determining whether a dragnet clause is valid. *See Schmitz v. Grudzinski*, 141 Wis.2d 867, 874–75, 416 N.W.2d 639 (Ct.App.1987):

> Though *Miller* is a Uniform Commercial Code case, and *Capocasa [v. First National Bank of Stevens Point*, 36 Wis.2d 714, 154 N.W.2d 271 (1967)]* involved a real estate mortgage, the *Miller* court used much the same method of analyzing the extent of a dragnet clause as did the court in *Capocasa.* The question in both cases was whether, as a matter of fairness or public policy, a dragnet clause would encumber property dissimilar to the property the parties originally contemplated as being subject to the dragnet clause.... Because this is a rule of policy, and does not depend upon factors unique to real estate or personal property, we conclude it is appropriate to use [the *Miller* rule] in analyzing any dragnet clause.

Imposing a requirement of "relatedness" even when a debt clearly falls within the literal language of an agreement precludes the use of any dragnet clause for otherwise unrelated debts when no such prohibition has been set forth in Article 9 of the Uniform Commercial Code. *See Hunter v. United States (In re Hunter)*, 68 B.R. 366, 368 (Bankr.C.D.Ill.1986) ("The minority view espoused in the latter line of cases [of requiring relatedness] cannot be reconciled with the express language of Paragraph 9–204(3)") (Altenberger, J.) (quoting the Illinois Code comments to § 9–204). A better approach seems to be that implied by the Wisconsin Supreme Court in allowing a dragnet clause to be enforced so long as either it 1) is clear in its language or 2) meets the relatedness requirement. To always engage in an inquiry as to the relatedness of the obligations would appear to allow the courts to overrule the legislature by writing into the statute a requirement that was not subject to a vote.

Although the Seventh Circuit has interpreted Wisconsin law to require relatedness when a dragnet clause is used, the outcome of the *Kazmierczak* case would have been no different had the two-step approach described above been employed. The Wisconsin Supreme Court has not spoken on the issue since. Blackhawk has not contested that "relatedness" is required under Wisconsin law, but rather has stated that "The credit card balance in this case is of the same class as the primary indebtedness secured by the Consumer Chattel Security Agreement and so related to it that the James' consent to its inclusion may be inferred." Thus, despite the express language of the agreement and the credit card regulations the parties have invited our attention to whether the credit card debt at issue in this case is related to the car loan.

■ To be related for analysis of a dragnet clause, the debt "must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred." *John Miller Supply*, 55 Wis.2d at 394, 199 N.W.2d 161 (quoting 2 Gilmore, Security Interests in Personal Property, sec. 35.2, p. 920). This test is often quoted by courts (although not by the Seventh Circuit in *Kazmierczak*), but its application is far

from clear in the present case. Determining whether the debts were of the same class is not an exact science. Blackhawk notes that the debts are both "consumer debts." Debtors assert that the debts are not related because the car loan was a closed-end credit agreement and the credit card was an open-end credit agreement. No clear standard has emerged in Wisconsin as to what constitutes a "class" of debt. However, another Wisconsin bankruptcy court has provided guidance on the subject.

Judge McGarity recently examined this issue under Wisconsin law, quoting a Tennessee bankruptcy court which "determined that the 'same class' test should only be applied to the 'extent necessary to distinguish between consumer and business transactions.'" *Swanson v. Montello State Bank (In re Hill)*, 210 B.R. 1016, 1022 (Bankr.E.D.Wis.1997) (quoting *In re Johnson*, 9 B.R. 713, 716 (Bankr. M.D.Tenn.1981)). Even though *Johnson* was subsequently mooted by the Tennessee legislature,[2] Judge McGarity found it a valid expression of the "classification" test for dragnet clauses:

> The classification test was later repudiated by the Tennessee legislature; however, the court's analysis of what constitutes the "same class" is still sound. *See In re Phillips*, 161 B.R. 824, 827 (Bankr. W.D.Mo.1993) [ (Koger, C.J.) ]. The *Phillips* court applied the Johnson standards and determined that because a mobile

home loan and Visa account were consumer debts, they were of the "same class." *Id.*

In our case, both the initial car loan and the credit card debt were consumer credit extended by Blackhawk to the James. The credit card debt was to be secured, *inter alia*, by any items purchased on the card as collateral. The fact that both debts were intended to be secured[3] and that both were for consumer purposes is sufficient under the test described in *Swanson* to find that both debts are of the same class.

Determining that the two debts fall within the same class may not be the end of the inquiry. The *Gilmore* test suggests that credit card debt must also be "so related to [the car loan] that the consent of the debtor to its inclusion [in the security agreement] may be inferred." Again, the standard for this determination is not entirely clear.

When examining consumer cases, some courts have apparently collapsed this requirement with the "class" inquiry and looked at whether a debt had a personal or a business purpose to determine whether the debts were related. *E.g.*, *Potomac Coal Co. v. $81,961.13*, 451 Pa.Super. 289, 679 A.2d 800, 805 (1996) (Stating that "if one contractual liability is secured to purchase a personal item and another is secured to purchase a business item, the contractual liabilities are not considered related."). It appears that this is the approach taken by Judge McGari-

---

**2.** In Tennessee, the legislature overruled both the "class" and "relatedness" requirements for dragnet clauses, but seemed to be somewhat befuddled by what debts would have been considered "related" or of the same class when it did so in enacting Tenn.Code Ann. § 47–50–112(b). That section provides in relevant part (emphasis added):

> Any contract, security agreement, note, deed of trust, or other security instrument, in writing and signed or endorsed by the party to be bound, that provides that the security interest granted therein also secures other provisions or future indebtedness, *regardless of the class of other indebtedness, be it unsecured, commercial, credit card, or consumer indebtedness*, shall be deemed to evidence the true intention of the parties, and shall be enforced as written[.]

**3.** Some courts have used whether or not a debt was secured to determine whether it was of the same class as another debt. *See First Nat'l Bank*

*of Wichita v. Fink*, 241 Kan. 321, 736 P.2d 909, 912–13 (1987) (In the process of holding that subsequent advances were subordinate to an intervening lien despite the presence of a dragnet clause in the original mortgage, the court stated that "The evidence in the record indicated that the subsequent advances were, in fact, signature loans on which there is generally no security whatsoever."). This approach appears to make little sense. If a creditor believed that a dragnet clause were valid, there would be no reason to attempt to separately secure a later debt, as one of the primary purposes of a dragnet clause is to obviate the need to file multiple financing statements. *See* Bruce A. Campbell, *Contracts Jurisprudence and Article Nine of the Uniform Commercial Code: The Allowable Scope of Future Advance and All Obligations Clauses in Commercial Security Agreements*, 37 Hastings L.J. 1007, 1012–16 (1986).

ty in *Swanson*, as she stated that "Because the debtors' Mortgage and Ready Reserve Accounts are of the same class, inclusion of the reserve accounts in the Mortgage's dragnet provision may be inferred." 210 B.R. at 1023.

The Wisconsin Supreme Court made separate inquiries in *John Miller Supply*, stating that subsequent debts would only fall within the scope of a dragnet clause if they were "of the same class as the primary obligation secured by the instrument *and* so related to it that the consent of the debtor to its inclusion may be inferred." 55 Wis.2d at 394, 199 N.W.2d 161 (quoting 2 Gilmore, Security Interests in Personal Property, sec. 35.2, p. 920) (emphasis added). As the court in *John Miller Supply* decided that the two business debts were unrelated, it appears to have viewed the class and relatedness tests as separate issues to be examined independently. *See id.* at 395, 199 N.W.2d 161.

Other courts have employed a slightly different standard for "relatedness," stating that "a dragnet clause will not be extended to cover future advances unless the advances are of the same kind and quality or relate to the same transaction or series of transactions as the principal obligation secured." *Mead Corp. v. Dixon Paper Co.*, 907 P.2d 1179, 1182 (Utah Ct.App.1995) (quoting *Heath Tecna Corp. v. Zions First Nat'l Bank*, 609 P.2d 1334, 1337 (Utah 1980)). Chief Judge Posner may have applied such a "series of transactions" standard in *In re Kazmierczak. See* 24 F.3d at 1022 ("Obviously the 1992 purchase was related to the 1991 one. In fact the two purchases were identical except for the date.").

This approach appears to be at least indirectly supported by the *John Miller Supply* case, in which the court quoted Gilmore as stating that dragnet clauses are "abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security agreement claims against the debtor which are *unrelated to the course of financing* that was contemplated by the parties." 55 Wis.2d at 393, 199 N.W.2d 161 (emphasis added). The primary obligation in *John Miller Supply* was a general revolving business credit agreement. *Id.* at 387, 199 N.W.2d 161. The security agreement contained a dragnet clause and the secured party later claimed that the dragnet clause reached far enough to cause "contingent contractual liabilities" to also be secured. *Id.* at 388–90, 199 N.W.2d 161. The court was somewhat skeptical that the contingent liabilities fell within the bounds of the dragnet clause, stating that "It is even doubtful that a cause of action not reduced to a judgment creates a liability except in the most conservative accounting sense." *Id.* at 392, 199 N.W.2d 161. Nevertheless, the court examined whether the liabilities were related and stated that "there [was] nothing to show that the parties ever intended that their security agreement would apply to future contingent liability on executory contracts between the parties and which were not similar and not related directly to the transaction set forth in the original security agreement." *Id.* at 395, 199 N.W.2d 161. Consequently, the Wisconsin Supreme Court held that the obligations were unrelated. *Id.*

In this case, there was no series of similar transactions. The question is whether there was any nexus whatsoever between the two debts. The debts are not so different as those in *John Miller Supply*. Neither is contingent. Blackhawk only claimed security for the credit card debt through the dragnet clause when the balance exceeded $1,000. Debtors indirectly took advantage of this by obtaining a credit limit in excess of $1,000. There is no direct evidence that Debtors were aware of the $1,000 "security floor" before they applied for the credit card, although they were on notice before they used the cards. Even though Debtors received a credit line in excess of the $1,000 security floor, there is no evidence that the interest rate they were charged reflected the added safety of the earlier security agreement by virtue of a lower interest rate or that a higher credit limit than would otherwise have been provided. *Cf. In re Kazmierczak*, 24 F.3d at 1022 (Stating that "the price in a contract can be evidence of its meaning.").

In addition to *Swanson*, at least two other cases have considered similar issues. *See In re Robinson*, 217 B.R. 527 (Bankr.E.D.Tex. 1998) (Sharp, C.J.); *In re Phillips*, 161 B.R.

824 (Bankr.W.D.Mo.1993) (Koger, C.J.). In *Robinson*, the debtors received a credit card in 1989 from a credit union. 217 B.R. at 529. In 1991, the debtors purchased a Ford truck and took a secured car loan from a dealership. *Id.* at 529. The security interest was then assigned to the same credit union that had issued the credit card. *Id.* at 529, 532. The security agreement contained a cross-collateralization clause for all other debts between the parties. *Id.* at 529. In light of the fact that the dealership and not the credit union was listed as the creditor on the loan agreement and the security agreement, "the vehicle and [credit card] debts were not between the same parties" and the dragnet clause was not valid. *Id.* at 532. In *Phillips*, the debtor had granted a purchase money security interest in a mobile home to a credit union. 161 B.R. at 825. The security agreement for the mobile home contained a dragnet clause. *Id.* At the time of the bankruptcy petition, the debtor also had a credit card balance of $1,142.83 on a card issued by the same credit union. *Id.* Chief Judge Koger stated that "Missouri, perhaps because of its more commercial orientation and less debtor oriented background, has not engaged in such anti dragnet comments [as have some other states]." *Id.* at 826. Even so, in holding the dragnet clause enforceable, Chief Judge Koger went on to state that "This Court need not consider whether Missouri would apply the classification test because both the mobile home loan and the [credit card] account are consumer debts, secured by consumer goods, and can be classified as the 'same class' under the *Johnson* standard." *Id.* at 827 (citing *Third Nat'l Bank v. Johnson*, 9 B.R. 713 (Bankr.M.D.Tenn.1981)).

This analysis leads me to the conclusion that the dragnet clause in our case should be enforced. The clause could not be clearer in specifying its wide reach and is literally the first line of the security agreement. In addition, Debtors were given a second notice of the potential for cross-collateralization in the credit card regulations.[4]

Assuming that Wisconsin requires a "class and relatedness" inquiry even if the clause is clearly written, the two debts are both of the consumer class. Under both the *Swanson* and *Phillips* decisions, consumer debts constitute a class. Although not identical in character, the two obligations are not nearly so dissimilar as those in *John Miller Supply*, and bear sufficient relation to each other to meet the second prong of the test. Moreover, the credit limit in excess of the security floor also allows consent to be inferred, particularly when combined with the clear language of the security agreement and the credit card regulations.

Nonetheless, this case may point out the very reason that courts have read a "relatedness" requirement into the law regarding dragnet clauses if Debtors' contentions are true. Both agreements have some characteristics of contracts of adhesion, although it could not be credibly argued that the dragnet clause appeared in fine print.

Ultimately, however, I cannot countenance Debtors' argument that they innocently signed various agreements, had no idea what they were signing, and were shocked that they had given such a broad security interest to Blackhawk. It may not be intuitively obvious to the average consumer that a credit card debt would be subject to an earlier security agreement, and the dragnet clause as written might potentially be viewed as "overly broad" when it simply refers to "all" obligations and does not provide even an illustrative list of potential liabilities that might become subject to it, but there is no reason why Blackhawk should be said to have a duty to inform Debtors orally about the effect of the dragnet clause which was clearly set forth in the first line of the security agreement they signed. If Debtors' argument were to prevail, consumers would be allowed to escape any otherwise valid agreements simply by arguing that they did not

---

4. .Whether a subsequent loan refers to a dragnet clause has been cited by courts as one factor in determining whether the dragnet clause should be enforced according to its terms. *See Estate of Simpson*, 403 N.W.2d 791, 793 (Iowa 1987) (Stating that "application of the relatedness rule does not render future advances clauses meaningless. Parties can either clearly state their intent when drafting a future advances clause or refer back to the clause when making new loans in order to clarify the series of transactions.").

read them and did not know what they were signing. Fairness does not permit us to give consumers the benefit of such agreements but not hold them to their side of the bargain.

## ORDER

IT IS HEREBY ORDERED that Defendant's lien related to its claim of $3,159.00 is VALID.