Ronald W. COUTTS, Petitioner-Appellant,

v.

WISCONSIN RETIREMENT BOARD, Respondent-Respondent †

CITY OF RACINE, Respondent. [Case No. 95-1905]

Byron DES JARLAIS, Petitioner-Respondent,

v.

WISCONSIN RETIREMENT BOARD, Respondent-Appellant. [Case No. 95-2228]

Court of Appeals

*Nos. 95–1905, 95–2228. Submitted on briefs December 12, 1995.—Decided March 28, 1996.*

(Also reported in 547 N.W.2d 821.)

†Petition to review granted.

179

180

For the petitioner-appellant the cause was submitted on the briefs of *Bruce F. Ehlke* of *Shneidman, Myers, Dowling & Blumenfield* of Madison.

For the respondent-appellant the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Lowell E. Nass*, assistant attorney general.

For the plaintiff-respondent the cause was submitted on the brief of *Lester A. Pines* of *Cullen, Weston, Pines & Bach* of Madison.

Before Eich, C.J., Dykman and Sundby, JJ.

DYKMAN, J. By order dated February 14, 1996, we consolidated these appeals because the issues presented by the parties are identical. In both cases, the parties have asked us to determine whether under § 40.65(5)(b)3, STATS., the Wisconsin Retirement Board (WRB) may reduce duty disability benefits by worker's compensation benefits which were paid to a participant before the duty disability benefit payments commenced. Section 40.65(5)(b)3 provides that the WRB shall reduce a protective occupation participant's[1] monthly duty disability benefit payment by "[a]ny worker's compensation benefit payable to the participant." In appeal No. 95-1905, the trial court concluded that under this statute, the WRB may reduce duty disability benefits with worker's compensation benefits which were paid before the duty disability benefits payments commenced, but in appeal No. 95-2228, the trial court concluded that the statute did not permit this. We conclude that the statute is unambiguous and that the WRB may not reduce duty disability benefits with worker's compensation benefits which are paid to a participant before the duty disability benefit payments commence. Accordingly, we reverse and remand appeal No. 95-1905 and affirm appeal No. 95-2228.

## BACKGROUND

### 1. Appeal No. 95-1905 - Ronald W. Coutts, Sr.

Ronald W. Coutts, Sr., was permanently injured while working as a fire fighter for the City of Racine in August 1988. After his recovery in January 1989, he returned to work performing light duties. In April

---

[1] See § 40.02(48), STATS.

1989, the Department of Industry, Labor and Human Relations (DILHR) concluded that Coutts was entitled to a worker's compensation permanent partial disability benefit for seventy-five weeks, retroactive to January 1989. By this time, he had accrued $1,319.91 of this benefit which he received in a lump sum. The remainder was paid, along with his wages, at a rate of $524.33 per month through February 1990.

In May 1989, the Department of Employe Trust Funds (DETF) determined that as a result of this injury, Coutts was also eligible to receive, under § 40.65, STATS., duty disability benefits. Coutts began receiving this benefit in November 1989, after he had retired and was no longer on the city's payroll. Over the next fourteen months, Coutts's monthly duty disability benefit payments were reduced by the total amount of worker's compensation that Coutts received for this injury, including those amounts paid to him before the duty disability benefit payments commenced.

Coutts appealed this reduction to a hearing examiner. He argued that his duty disability benefit could only be reduced by worker's compensation paid to him after his monthly duty disability benefit payments commenced and not by those amounts of worker's compensation paid to him beforehand. The examiner concluded that the WRB may reduce a participant's duty disability benefits by the entire amount of worker's compensation a participant receives regardless of when the worker's compensation is paid. The WRB adopted this conclusion and Coutts petitioned the trial court for *certiorari* review. The court concluded that the statute was ambiguous but deferred to the WRB's interpretation because it found it to be reasonable. Accordingly, it affirmed. Coutts appeals.

### 2. *Appeal No. 95-2228 - Byron L. Des Jarlais*

Byron L. Des Jarlais injured his back after slipping and falling on ice while working as a deputy sheriff for Vilas County in March 1987. In February 1988, DILHR concluded that Des Jarlais was entitled to a worker's compensation permanent partial disability benefit of $8,190 for seventy weeks. By this time, $3,100.50 had accrued and was paid to him in a lump sum. The remaining balance was paid to him in monthly installments between March and December of 1988.

In February 1991, Des Jarlais re-injured his back while at work. In June 1993, DILHR determined that he was entitled to receive an additional worker's compensation permanent partial disability benefit of $587.33.

Meanwhile, in April 1991, DETF had determined that as a result of Des Jarlais's March 1987 injury, he was also eligible to receive, under § 40.65, STATS., duty disability benefits. Des Jarlais began receiving this benefit in September 1991, after he had retired. Over the next one-and-one-half years, his monthly duty disability benefit payments were reduced by the total amount of worker's compensation that Des Jarlais received for this injury, including those amounts paid to him in 1988 before the duty disability benefit payments commenced.

Des Jarlais appealed this reduction to a hearing examiner, making the same arguments as Coutts. The examiner reached the same conclusion as in Coutts's case and the WRB adopted this conclusion. Des Jarlais petitioned the trial court for *certiorari* review. The court concluded that the WRB's decision was entitled to great weight but that its interpretation was unreasonable. Accordingly, it reversed. The WRB appeals.

## STANDARD OF REVIEW

On *certiorari*, our scope of review is identical to that of the trial court. *Hill v. LIRC*, 184 Wis. 2d 101, 109, 516 N.W.2d 441, 445 (Ct. App. 1994). We review the administrative agency's decision and not that of the trial court. *Id.* In so doing, we determine whether the agency kept within its jurisdiction, whether it acted according to law, whether its action was arbitrary, and whether the evidence was such that it might reasonably make the order or determination in question. *Schmidt v. Wisconsin Employe Trust Funds Bd.*, 153 Wis. 2d 35, 40, 449 N.W.2d 268, 270 (1990).

The issue before us involves a dispute over the proper construction of § 40.65(5)(b)3, STATS. Our primary purpose when interpreting a statute is to give effect to the legislature's intent. *Riverwood Park, Inc. v. Central Ready-Mixed Concrete, Inc.*, 195 Wis. 2d 821, 827, 536 N.W.2d 722, 724 (Ct. App. 1995). We first look at the language of the statute and if that language is clear and unambiguous, we construe the statute in accordance with its ordinary meaning. *Id.* at 828, 536 N.W.2d at 724. A statute is ambiguous if it is capable of being understood by reasonably well-informed persons as having two or more different meanings. *Id.* If the statute is ambiguous, then we may examine its content, subject matter, scope, history and the object to be accomplished. *Id.*

We apply three levels of deference to conclusions of law made by an administrative agency. *Sauk County v. WERC*, 165 Wis. 2d 406, 413, 477 N.W.2d 267, 270 (1991). The greatest deference given to agency interpretations is the "great weight" standard which we use

186

when the "agency's experience, technical competence, and specialized knowledge aid the agency in its interpretation and application of the statute . . . ." *Id.* (quoted source omitted). The next level of review is the "due weight" or "great bearing" standard which we use when "the agency decision is 'very nearly' one of first impression." *Id.* at 413-14, 477 N.W.2d at 270 (citation omitted). The lowest level of deference is the *de novo* standard, in which no weight is given when the case is one of first impression and the agency has no special expertise or experience in the particular area. *Id.* at 414, 477 N.W.2d at 270-71.

None of the parties cite any Wisconsin appellate decision addressing whether duty disability benefits may be reduced by worker's compensation benefits which were paid to a participant before the monthly duty disability benefit payments commenced. Because this is an issue of first impression before us and the WRB does not have special technical expertise or much experience in construing the phrase "any worker's compensation benefit payable to the participant," we apply a *de novo* standard of review.

## DISCUSSION

Section 40.65(5)(a), STATS., sets the amount of a participant's monthly duty disability benefit at eighty percent of his or her monthly salary. The monthly payment, however, may be reduced by other income and benefits received by the participant including worker's compensation. Section 40.65(5)(b). That statute provides in relevant part:

> *The Wisconsin retirement board shall reduce the amount of a participant's monthly benefit under this section by the amounts under subds. 1. to 6. . . .*

The Wisconsin retirement board may assume that any benefit or amount listed under subds. 1. to 6. is payable to a participant until it is determined to the board's satisfaction that the participant is ineligible to receive the benefit or amount, except that the department shall withhold an amount equal to 5% of the monthly benefit under this section until the amount payable under subd. 3. is determined.

1. Any OASDHI[2] benefit payable to the participant or the participant's spouse or a dependent because of the participant's work record.

2. Any unemployment compensation benefit payable to the participant because of his or her work record.

3. *Any worker's compensation benefit payable to the participant,* including payments made pursuant to a compromise settlement under s. 102.16(1). A lump sum worker's compensation payment or compromise settlement shall reduce the participant's benefit under this section in monthly amounts equal to 4.3 times the maximum benefit which would otherwise be payable under ch. 102 for the participant's disability until the lump sum amount is exhausted.

4. Any disability and retirement benefit payable to the participant under this chapter, or under any other retirement system, that is based upon the paricipant's earnings record and years of service. . . .

5. All earnings payable to the participant from the employer under whom the duty disability occurred.

6. All earnings payable to the participant from an employer, other than the employer under

---

[2] OASDHI refers to "federal old-age, survivors, disability and health insurance under Titles II and XVIII of the federal social security act." Section 40.02(43), STATS.

whom the duty disability occurred, and all income from self-employment . . . .

(Emphasis added).

The resolution of this case turns on whether the phrase "any worker's compensation benefit payable" as used in § 40.65(5)(b)3, STATS., refers to worker's compensation benefits which have already been paid to a participant before the duty disability benefit payments commence. Coutts and Des Jarlais argue that the use of the word "payable" in § 40.65(5)(b)3 is unambiguous and permits the WRB to reduce the monthly duty disability benefit payment by worker's compensation benefits payable to a participant after the duty disability benefit payments commence. Des Jarlais argues that if the legislature intended to permit reductions for worker's compensation benefits that have already been paid to a participant, the legislature would have used the term "paid" instead of "payable." *See, e.g.,* § 30.20(2)(b), STATS. ("Title to the royalties to be paid when mining operations are begun shall be determined at such future time as royalties for ores so sold are paid or are due and payable"); § 32.61(4)(c), STATS. ("The city shall enter the revised assessment on the tax roll in one sum if the original benefit assessment was payable or paid in one sum . . . ."); and § 946.86(1)(d), STATS. ("Any amount payable or paid under any contract for goods or services . . . ."). They both argue that an interpretation that permits reductions for prior payments of worker's compensation leads to absurd results because it would permit reductions for any earnings or benefits paid to a participant at any time.

Alternatively, the WRB focuses on the word "any," arguing that this is an inclusive word by which the legislature intended that all worker's compensation benefits relating to the same disability are to be used to

reduce the monthly duty disability benefit payments regardless of when they are paid to a participant. The WRB contends that the legislature enacted § 40.65(5)(b), STATS., to coordinate this program with other earnings and benefits a participant may receive so that a participant could not obtain more money than his or her pre-retirement income at any given time. The WRB insists that if "payable" refers to future worker's compensation benefits only, then two similarly situated participants who apply for duty disability benefits and worker's compensation at different times would receive different amounts from the state.

Our analysis begins with the statutory language. Section 40.65(5)(b)3, STATS., provides that a participant's monthly duty disability benefit payment will be reduced by "[a]ny worker's compensation benefit payable" to that participant. The words "any" and "payable" are not defined in the legislative scheme; thus, we may resort to a dictionary to establish their ordinary meanings. *Borgen v. Economy Preferred Ins. Co.*, 176 Wis. 2d 498, 505, 500 N.W.2d 419, 421-22 (Ct. App. 1993). "Any" is generally understood to mean every. In WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1659 (1990), "payable" is defined as "requiring to be paid," "capable of being paid," "due," and "specifying payment to a particular payee . . . at a specified time or occasion." BLACK'S LAW DICTIONARY 1128 (1990), defines "payable" as:

> Capable of being paid; suitable to be paid; admitting or demanding payment; justly due; legally enforceable. A sum of money is said to be payable when a person is under an obligation to pay it. Payable may therefore signify an obligation to pay at a future time, but, when used without quali-

fication, term normally means that the debt is payable at once, as opposed to "owing."

These dictionary definitions show that the word "payable" refers to the future nature of the action. We therefore conclude that the language in this statute is unambiguous and susceptible to one reasonable interpretation in light of these definitions: the WRB may only reduce monthly duty disability benefit payments by worker's compensation that has not yet been paid to the participant and not by those worker's compensation payments which the participant has already received. Thus, on a particular date, a participant may only have his or her monthly duty disability benefit payment reduced by the amount of worker's compensation that is payable to the participant on that same day or in the future. Moreover, if the combined amount of other earnings or benefits exceeds the monthly duty disability benefit payment, that participant will not receive a monthly duty disability payment and the WRB may not carry forward or "bank" the excess amount and deduct it from the participant's next month's duty disability benefit payment. That would be contrary to the statute because the statute only permits reductions for amounts payable when the monthly duty disability benefit payment is due and not amounts paid.

Additionally, the WRB's position must be rejected because it would permit reductions for worker's compensation benefits received by a participant at any time and for any disability. While the WRB reads § 40.65(5)(b)3, STATS., as limiting the reduction for worker's compensation paid to a participant which relates to the same disability, that limitation cannot be found in the statutory language. Section 40.65(5)(b)3

provides a reduction for "[a]ny worker's compensation benefit payable to the participant, including payments made pursuant to a compromise settlement . . . ." There is no language in this statute which indicates that the worker's compensation must be for a related disability. Indeed, if the WRB treats § 40.65(5)(b)5, which provides reductions for "[a]ll earnings payable to the participant," as permitting reductions only for earnings due to a participant when the monthly duty disability benefit is paid and not for earnings already received, then there is no reason why the use of the word "payable" in § 40.65(5)(b)3 should be interpreted any differently.

But the WRB responds that under § 40.65(5)(b), STATS., it must reduce a participant's monthly duty disability benefit payments by five percent if the participant's worker's compensation benefits have not yet been determined. This shows that the legislature was not concerned with when those worker's compensation payments are paid for the purpose of reducing the monthly duty disability benefit payment. We disagree.

Section 40.65(5)(b), STATS., addresses a situation in which a participant has yet to be paid worker's compensation and merely acknowledges that those amounts will be paid in the future. Thus, permitting such a reduction now even though a worker's compensation benefit payment has not yet been received is consistent with an interpretation permitting reductions for future benefit payments. It does not suggest that past worker's compensation payments may reduce duty disability benefits.

Further, the WRB asserts that if § 40.65(5)(b)3, STATS., only permits reductions for future worker's compensation payments, then the part of § 40.65(5)(b)3

which provides a formula for reductions for lump-sum worker's compensation payments would be rendered surplusage. We disagree. This portion of § 40.65(5)(b)3 merely addresses how a lump-sum worker's compensation payment should be apportioned and used to reduce a monthly duty disability benefit payment until the worker's compensation is exhausted. It prevents the WRB from reducing at once a participant's monthly duty disability benefit payment with the entire lump-sum payment. The statute serves a functional purpose and in no way bears on the meaning of "payable" in § 40.65(5)(b)3.

The WRB also argues that if it cannot reduce a participant's monthly duty disability benefit payment by past worker's compensation payments, then persons otherwise similarly situated who apply for duty disability benefits at different times would receive different benefit amounts. The problem with this argument is that these two hypothetical participants are not otherwise similarly situated. The participant who waits several months or years to apply for duty disability benefits will forego receiving those benefits during those months or years. Thus, an eligible participant has every incentive to apply for this benefit even if it is reduced partially or totally by worker's compensation or some other income or benefit.[3] Duty disability benefits are not retroactive; it is not clear that in the long

---

[3] Moreover, with regard to a participant who is receiving duty disability benefits but has not applied for worker's compensation, the WRB may assume a benefit is payable until it determines that the participant is ineligible to receive that benefit. Section 40.65(5)(b), STATS. The WRB will reduce that participant's monthly duty disability benefit payment by five percent.

run, a person who waits to apply for duty disability benefits will be better off than someone who does not.

The dissent deems the statute ambiguous because two trial judges and this court are divided as to its interpretation. It then argues that the legislative history of § 40.65(5), STATS., "shows that the legislature used 'payable' solely in the sense of entitlement." Dissent at 199. But the only legislative history the dissent discusses is a memo prepared by the League of Wisconsin Municipalities outlining the statute and a letter by the Director of Retirement Research describing the League's memo "as good an outline of the 66.191 plan as there is." Dissent at 202. The dissent focuses upon the term "double dipping" from the League's memo and then defines the term as a participant who "receive[s] benefits for the same injury under the worker's compensation act and the duty disability benefits statute." Dissent at 198. From this, the dissent concludes that it is bad public policy to permit participants to "double dip."

The problem with the dissent's position is twofold. First, we have recognized the dangers of examining the legislative history of a statute and picking and choosing those parts which support one position over another. *See Town of Hallie v. City of Eau Claire*, 176 Wis. 2d 391, 396-97, 501 N.W.2d 49, 51 (Ct. App. 1993), *overruled on other grounds by Wagner Mobil, Inc. v. City of Madison*, 190 Wis. 2d 585, 527 N.W.2d 301 (1995). We likened this process to entering a crowded party and looking for our friends. We concluded that the sort of legislative history analysis now used by the dissent demonstrated the "tenuous nature of legislative history analysis." *Id.*

Second, we do not know what the League meant by "double dipping" or whether the legislature agreed

194

with the League's position. Is being paid the same amount as other workers receive for the loss of an arm or a leg "double dipping"? We do not know. The dissent suggests that we should defer to the intent of the League and not that of the legislature to answer this question. But "[w]e are governed by laws, not by the intentions of legislators [or the League of Wisconsin Municipalities]." *Hallie*, 176 Wis. 2d at 397, 501 N.W.2d at 51 (quoted source omitted). We fail to see how the League's memo shows that the legislature used the term "payable" to mean "entitlement."

But because we have concluded that the language of § 40.65(5)(b)3, STATS., is unambiguous, we must base our conclusions of *legislative* intent on the language of § 40.65(5)(b)3 only. The language of that statute indicates only that the legislature intended to prevent a participant from receiving both worker's compensation and duty disability benefits at the same time. The language of the statute does not indicate that the legislature intended that a participant could not receive both worker's compensation and duty disability benefits provided those amounts were paid to the participant at different times.[4]

In Coutts's case, the WRB initially reduced his monthly duty disability benefit payments by his earnings and the worker's compensation benefits payable to him on those dates. Because Coutts was receiving a full salary and worker's compensation, his monthly duty

---

[4] Adopting the dissent's interpretation of § 40.65(5)(b)3, STATS., leads to the conclusion that any worker's compensation for any injury, whenever earned, must be "banked" and deducted from a participant's monthly duty disability benefit payment. The WRB does not support this interpretation, nor does the statute or legislative history.

disability benefit payment was reduced to zero. This continued through September 30, 1989, when Coutts retired. In November 1989, Coutts began receiving a monthly duty disability benefit payment which was reduced by $524.33, his monthly worker's compensation benefit that was payable to him at that time. Coutts does not dispute these reductions.

■

In February 1990, when Coutts's worker's compensation payments ended, his monthly duty disability benefit payments should not have been reduced. However, the WRB continued to reduce them by the amount of worker's compensation which he received between January 1989 and September 1989. This was inconsistent with the statute. First, the worker's compensation he received between January 1989 and September 1989 should not have been used to reduce his duty disability benefits because those sums were not payable to him after February 1990, but instead had been paid to him in the past. Second, the amount of worker's compensation paid to Coutts during this time should not have been used to reduce Coutts's monthly duty disability benefit payments after September 30, 1989, because the monthly duty disability payment was reduced to zero by Coutts's earnings. The state cannot "bank" and carry forward excess amounts of benefits to reduce the monthly duty disability benefit payments. In other words, when a participant receives earnings and benefits at the same time he or she receives a monthly duty disability benefit payment, those earnings and other benefits may be used to reduce the monthly duty disability benefit payment to zero, but excess earnings and benefits cannot be "banked" and carried forward to be used to reduce a future monthly duty disability benefit payment. Section 40.65(5)(b),

STATS., only permits reductions in monthly duty disability benefit payments for those earnings and benefits payable at the same time and not for those earnings and benefits paid in the past or in excess of those paid in the past.

With respect to Des Jarlais, the WRB reduced, on a monthly basis, his duty disability benefits which he began receiving in August 1991 by a total of $8,190, his total worker's compensation benefits received in 1988. This is inconsistent with the statute because he received those worker's compensation payments before he became eligible for duty disability benefits and, therefore, for the purpose of § 40.65(5)(b)3, STATS., they were not payable to him. However, the WRB correctly reduced Des Jarlais's June 1993 duty disability benefit payment by the June 1993 worker's compensation benefit of $587.33 because his duty disability benefit payments were being paid to him then.

*By the Court.*—Appeal No. 95-1905 reversed and cause remanded with directions. Appeal No. 95-2228 affirmed.

SUNDBY, J. (*dissenting*). I conclude that it is bad public policy and contrary to the legislative purpose in enacting § 40.65, STATS., to permit protective occupation employees to "double dip"; that is, to receive benefits for the same injury under the worker's compensation act and the duty disability benefits statute. I therefore dissent.

The legislative history of § 40.65, STATS., shows that the legislature wished to give very generous duty disability benefits to protective occupation employees because of the hazardous nature of their duties. How-

ever, it recognized the danger of perpetuating a duty disability benefit program which allowed employees to retire on disability but receive benefits exceeding their earnings at retirement.

Although we consolidated these appeals, I can best show how the duty disability law operates and its potential for abuse by considering Ronald W. Coutts's case. The parties stipulated that:

1. Coutts was injured August 3, 1988.

2. He suffered a permanent partial disability scheduled under § 102.52(1), STATS.—loss of arm at the shoulder: 500 weeks. However, because his loss of use was fifteen percent, his compensation was for seventy-five weeks.

3. By stipulation and order entered April 7, 1989, Coutts was paid a lump sum to compensate him for the period between the date of his injury and the date of the order.

4. After payment of attorney fees and the lump sum payment, Coutts was entitled to worker's compensation of $6,393.84 payable in thirteen monthly installments. The insurer made those payments between May 8, 1989, and February 19, 1990.

5. Coutts continued to work full time for the Racine Fire Department until September 30, 1989, and was paid full salary of $3,387.07 per month.

6. On March 20, 1989, Coutts applied for duty disability benefits under § 40.65, STATS. The parties stipulated that Coutts was required to retire because of his permanent physical limitations. On May 18, 1989, the department determined that Coutts was eligible for duty disability benefits of seventy-five percent of his monthly salary, or $2,540.30.

7. The department paid Coutts duty disability benefits for the payroll periods October 1989 through

January 1990. From each payment it deducted $524.33 until the worker's compensation payments were recovered. The parties stipulated that, in effect, the department computed Coutts's duty disability benefits as if the effective date of such benefits was the date of Coutts's retirement, September 30, 1989.

## THE LAW

The department argues that where the employee's retirement is made necessary by the injury for which he or she has received worker's compensation and the employee seeks duty disability benefits under § 40.65, STATS., the department is required by § 40.65(5)(b)3 to reduce the amount of the participant's monthly duty disability benefit by any worker's compensation paid or payable to the participant. Coutts contends that such offset is permitted by the statute only when worker's compensation benefits and duty disability benefits are payable at the same time. Coutts gives the word "payable" a temporal component. The legislative history of § 40.65 shows that the legislature used "payable" solely in the sense of entitlement. Coutts's argument also fails because both the language of the statute and its legislative history show that duty disability benefits are intended to be *in lieu* of worker's compensation, not in addition thereto.

Section 40.65(2)(b), STATS., applies to protective occupation participants "who first apply for benefits under this section on or after May 3, 1988." Thus, duty disability benefits are not automatic if the employee's disability causes him or her to retire. To be entitled to duty disability benefits, an employee who retires must demonstrate that he or she was injured on the job or contracted a job-related disease, his or her disability is

likely to be permanent, and the disability caused the employee to retire. Section 40.65(4).

Coutts's monthly duty disability benefit "is 75% of [his] monthly salary adjusted under par. (b) and sub. (6)." Subsection (6) does not apply to Coutts's benefit.

Paragraph (b) of 40.65(5), STATS., provides in part:

> The Wisconsin retirement board shall reduce the amount of a participant's monthly benefit under this section by the amounts under subds. 1. to 6. . . . The Wisconsin retirement board may assume that any benefit or amount listed under subds. 1. to 6. is payable to a participant until it is determined to the board's satisfaction that the participant is ineligible to receive the benefit or amount, except that the department shall withhold an amount equal to 5% of the monthly benefit under this section until the amount payable under subd. 3. is determined.

"[T]he amount payable under subd. 3" is "[a]ny worker's compensation benefit payable to the participant," *see* § 40.65(5)(b)3, STATS. The intent of the legislature that an employee's election of duty disability benefits shall be *in lieu* of worker's compensation is evident from its treatment of lump sum settlements. Subdivision 3 further provides:

> A lump sum worker's compensation payment or compromise settlement shall reduce the participant's benefit under this section in monthly amounts equal to 4.3 times the maximum benefit which would otherwise be payable under ch. 102 for the participant's disability until the lump sum amount is exhausted.

If Coutts and the insurer had settled his claim by a lump sum payment, it is clear that his duty disability benefits would have been reduced by the worker's compensation payment. It is illogical to conclude that the

amount of a participant's monthly duty disability payment depends on the way his or her worker's compensation claim is settled.

Coutts points to subd. 5 of § 40.65(5)(b), STATS., to illustrate the absurdity of giving the word "payable" a "retroactive" construction. That provision requires the board to reduce the amount of a participant's monthly duty disability payment by "[a]ll earnings payable to the participant from the employer under whom the duty disability occurred." He argues that the board's construction of "payable" would require it to apply against his duty disability benefit all wages he ever earned from the City of Racine. Of course, that would wipe out any duty disability benefits. That construction is unreasonable. *See Currie v. Schwalbach*, 132 Wis. 2d 29, 42, 390 N.W.2d 575, 580 (Ct App. 1986) ("Absurd and unreasonable constructions and applications of statutes are to be avoided."), *aff'd*, 139 Wis. 2d 544, 407 N.W.2d 862 (1987). Further, Coutts's argument does not consider that the duty disability benefit is a percent of the employee's monthly salary. It would give the employee an unintended windfall to require the department to determine his or her monthly benefit by including earned but unpaid earnings. The legislative history of § 40.65 shows that the legislature also intended to exclude subsequent earnings payable to the employee.

The majority avoids considering the legislative purpose of the statute by finding that the word "payable" is unambiguous. I agree that just because the parties disagree as to the meaning of a statute, phrase or word does not make it ambiguous. However, here, two highly competent, respected trial judges in well-written opinions reach opposite results. Our panel is divided. Not unexpectedly, each party believes that the

201

plain meaning of § 40.65, STATS., supports its position. The difficulty, of course, is that the parties reach opposite conclusions as to the "plain" meaning of the language. I am satisfied that the statute is ambiguous and we may resort to extrinsic aids, including legislative history, to resolve the ambiguity. *See Village of Shorewood v. Steinberg*, 174 Wis. 2d 191, 202, 496 N.W.2d 57, 61 (1993).

Section 40.65, STATS., was created by ch. 278, Laws of 1981, which also created § 66.191(7), STATS., to read: "Beginning on the effective date of this subsection (1981), any person who is eligible for a duty disability benefit under s. 40.65 is not eligible for a benefit under this section."

The drafting records contain a memo prepared by the League of Wisconsin Municipalities describing the then current "special disability benefit" under § 66.191, STATS., for protective occupation employees and the alternative proposal agreed to by an ad hoc committee of municipal employers and representatives of employee organizations. The Director of Retirement Research, in a letter to the Legislative Reference Bureau, described the memo as "as good an outline of the 66.191 plan as there is." The memo stated:

> A second benefit of this proposal is that it newly recognizes offsets against the guaranteed level of "maintenance income" and thereby reduces the potential for double or triple dipping. . . . While the proposal would establish a higher percent [then 50%] of final salary as the benefit level, this higher level would be reduced through offsetting the major collateral benefits which a disabled person could expect to receive, as well as subsequent wages and other income which that employe might earn . . . .

The majority criticizes my use of this memo as "defer[ring] to the intent of the League [of Wisconsin Municipalities] and not that of the legislature . . . ." Majority op. at 195. This is an unfair criticism because, as I pointed out in my dissent, the Director of Retirement Research, in a letter to the Legislative Reference Bureau, described the memo as "as good an outline of the 66.191 plan as there is." The author of the majority opinion has not researched the legislative history of § 40.65, STATS., because he finds the statute unambiguous. If that position is sound, why does the author spend so much time attacking my review of the legislative history? It is unfair for the author to attack my review of the legislative history without examining that history. As long as the majority is now willing to explore the legislative history, further development of that history is appropriate.

The bill which created § 40.65, STATS., was approved by the Joint Survey Committee on Retirement Systems, which found that "the bill reflects good public policy." Drafting record of ch. 278, Laws of 1981, LRB-4909/1 (Joint Survey Committee Report). The Joint Survey Committee was required to report to the legislature as to the public policy implicated in any legislative proposal affecting the retirement of or payment of pensions to public officers or employees. Section 13.50(6), STATS., 1981-82. In fact, the legislature could not enact any bill or amendment affecting the retirement or pensions of public officers or employees until it had received the report of the Committee. In its statement of the public policy of proposed § 40.65, the Committee stated that "[t]he [66.191 duty disability benefits] program is criticized by employers who believe that it provides duplicate benefits in some circumstances, and it is also criticized by employees who

believe the program is inadequate in other circumstances." Drafting record, LRB-4909/1 at 3. The Committee pointed out that the duty disability benefit program "has been developed by employer and employee representatives who have met over the last year and one-half as an Ad Hoc Committee." *Id.* The Committee found that the bill "reflects good public policy" because it corrected these problem areas. *See id.*

Regrettably, the majority has chosen an approach to this debate which gives the reader only part of the story. Had the author of the majority opinion done the research of the legislative history which I have done, he would have understood what the League meant by "double dipping." The Report of the Joint Survey Committee makes clear that one of the problems studied by the Ad Hoc Committee was that duty disability benefits under § 66.191, STATS., 1981-82, were "not . . . coordinated with other income replacement programs such as social security, worker's compensation, unemployment compensation, the state retirement system, etc." Drafting record, LRB-4909/1 at 3. The Committee described § 40.65, STATS., as follows: "The new program provides disability benefits at 80% of the salary at the time of disability, indexed for inflation, *but offset by other sources of income such as social security, worker's compensation, unemployment compensation, other retirement benefits and current earnings.*" Drafting Record, LRB-4909/1 at 2 (emphasis added).

The legislative history of § 40.65, STATS., makes clear the purpose of the statute. The majority avoids giving effect to that purpose by ignoring it. The canon of legislative construction which does not permit examination of the legislative history of a statute is premised on the fact that the language of the statute is so clear that language must be followed regardless of

what the legislature intended. In other words, the legislature dropped a stitch in expressing its intent. I cannot say with the majority's insouciance that the statute is so clear on its face that there is no room to determine and apply the legislative intent. I believe I am entitled to hold that opinion without being unfairly criticized by the majority for "picking and choosing" those parts of the legislative history which support my position. I challenge the majority to find *any* part of the legislative history of § 40.65 which supports its position.

While there is no suggestion in the record or briefs that Coutts delayed his retirement until he exhausted most of his worker's compensation benefits, his situation demonstrates how the "double dipping" the legislature targeted could be achieved if § 40.65(2)(b), STATS., is construed as plaintiffs urge. I reject that construction as bad public policy and contrary to the legislative purpose. I therefore dissent.