In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1757

FIRST BANK & TRUST, formerly known as
FIRST BANK & TRUST OF EVANSTON, BURLING
BANK, CAMBRIDGE BANK OF LAKE ZURICH, et al.,

Plaintiffs-Appellants,

v.

FIRSTAR INFORMATION SERVICES, CORPORATION,
a dissolved Wisconsin corporation, and
FIRSTAR CORPORATION, a Wisconsin corporation,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2972--John W. Darrah, Judge.

ARGUED OCTOBER 22, 2001--DECIDED December 31, 2001

Before FLAUM, Chief Judge, RIPPLE and
WILLIAMS, Circuit Judges.

RIPPLE, Circuit Judge.  Between 1994 and
1998, First Bank & Trust and ten other
banks/1 (collectively "Banks") sepa-
rately contracted to purchase data
processing services from Firstar
Corporation and its former affiliate,
Firstar Information Services Corporation
(collectively "Firstar"). Prior to the
expiration of the agreements, however,
Firstar decided to cease its data
processing operations and to terminate
all services to the Banks. Upon receiving
notice of these intentions, the Banks
filed these breach of contract claims
against Firstar in Illinois state court.
After removal of the case to the federal
system, the district court entered
summary judgment for Firstar. The court
concluded that the terms of the
agreements unambiguously authorized
Firstar's actions so long as Firstar gave
the Banks proper notice of the
termination of services. For the reasons
set forth in the following opinion, we
reverse the judgment of the district
court and remand the case for further
proceedings consistent with this opinion.

I

BACKGROUND

A. Facts

Each of the Banks is an independent financial institution with branches in the state of Illinois. Firstar Corporation and its former affiliate, Firstar Information Services,/2 offered data processing services to banks. Because developing and maintaining an in-house data processing system often proves costly for financial institutions such as the Banks, they frequently turn to outside vendors such as Firstar for their data processing needs.

From 1994 through 1998, each of the Banks separately contracted to purchase multiple data processing services from Firstar. Although each Bank independently negotiated its agreement with Firstar, the contracts contained nearly identical provisions. In particular, each contract contained clauses that addressed the termination or modification of the agreement. Section 2 of each contract provided:

This Agreement may be terminated at the end of the term set forth above, provided that Customer gives Firstar at least *** days' prior written notice. . . . This Agreement may also be terminated by a non-defaulting party in the case of an event of default hereunder./3

R.14, Ex.D.

Each agreement also contained Section 7--a provision entitled "Systems Modification." Although the precise language of Section 7 varied among the contracts, each agreement stated in pertinent part:

Firstar may modify, amend or replace any Service or any element of its systems at any time when Firstar deems that such is appropriate or necessary. Firstar may terminate providing any Service upon [180/270/360] days' prior written notice to Customer and may terminate any Service immediately upon any action by any regulatory agency, legislative body or court having jurisdiction over Firstar or Customer which Firstar deems to have an adverse material effect on such Service or requires termination of such

Service./4

R.14, Ex.D. In eight of the agreements, Section 7 further provided:

In the event Firstar terminates providing one of the "Core Services" . . . that is used by the Customer, and Firstar fails to replace such a Core Service, prior to termination of said Core Service, with a substitute product of comparable feature, function and pricing, Customer may terminate this Agreement without being in default . . . ./5

R.14, Ex.D. For several months, the Banks and Firstar operated under the terms of these agreements without incident.

In October 1998, Firstar informed the Banks that it intended to cease its data processing operations due to its impending merger with Star Bank. Firstar offered to provide the Banks with services until June 30, 2000. The first of the agreements between the Banks and Firstar was not scheduled to expire until July 31, 2001.

B. District Court Proceedings

1.

In April 2000, the Banks filed this action against Firstar in Illinois state court alleging that Firstar had breached its agreements to provide them with data processing services. Two of the Banks also alleged that Firstar's cessation of services had violated provisions of the Illinois Consumer Fraud Act. Invoking the diversity jurisdiction of the federal courts, Firstar removed the case to the federal system.

Once before the district court, Firstar moved for judgment on the pleadings as to the breach of contract claims. Firstar submitted that Section 7 expressly permitted it to terminate all services to the Banks prior to the expiration of the contracts. This provision stated that "Firstar may terminate providing any Service upon . . . prior written notice to Customer." R.14, Ex.D. According to Firstar, "any" as used in this provision unambiguously meant "all" or "every." Read in this manner, Section 7 permitted Firstar to terminate all services so long as it provided the proper notice to the

Banks. None of the contracts required more than 360 days' notice to terminate services. By giving the Banks roughly two-years' notice before the cessation of services, Firstar argued that it had met its contractual obligations and thus could not be held liable for breach of contract.

At the same time, the Banks moved for partial summary judgment on the contract claims. They contended that the district court should not read Section 7 in such a broad manner. The Banks submitted that "any" meant "one" or "some." In addition, the Banks argued that, if Firstar had breached the agreements, this breach did not activate a limitation of remedies provision found in nine of the contracts.

2.

After considering the parties' positions, the district court entered summary judgment for Firstar./6 In interpreting the contract, the district court found Section 7 unambiguous. Relying on Wisconsin case law, the court concluded that "any," as used in Section 7, meant "without limit." Under this view, the plain terms of the agreements thus permitted Firstar to terminate as many services as it deemed fit-- including all services--so long as it gave proper notice to the Banks. Because Firstar had satisfied the contracts' notice requirements, the district court concluded that the company had complied with its obligations under the agreements and thus could not be held liable for breach of contract./7

II

DISCUSSION

A.  Standard of Review

We review de novo the district court's grant of summary judgment. See Thomas v. Pearle Vision, Inc., 251 F.3d 1132, 1136 (7th Cir. 2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986). The court's function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We must ask whether "there are genuine factual issues that can properly be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. In assessing whether a genuine issue of material fact exists, we must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. See id. at 255; Basith v. Cook County, 241 F.3d 919, 926 (7th Cir. 2001).

## B. Principles of Contract Interpretation

Before turning to the language of the contract, we set forth the principles that will guide our inquiry. This court has stated that "interpretation of an unambiguous contract is a question of law." Bechtold v. Physicians Health Plan of N. Ind., Inc., 19 F.3d 322, 325 (7th Cir. 1994) (citing Ryan v. Chromalloy Am. Corp., 877 F.2d 598, 602 (7th Cir. 1989)); see also Lakeshore Commercial Fin. Corp. v. Drobac, 319 N.W.2d 839, 843 (Wis. 1982). Wisconsin's law of contracts,/8 which governs this dispute, is well-settled. When interpreting an agreement, the court's objective "is to ascertain the true intentions of the parties as expressed by the contractual language." State ex rel. Journal/Sentinel, Inc. v. Pleva, 456 N.W.2d 359, 362 (Wis. 1990). In doing so, the court must first consider the plain language of the agreement. See Bank of Barron v. Gieseke, 485 N.W.2d 426, 432 (Wis. Ct. App. 1992). Unless a term is expressly defined in the contract, words and phrases must be given their plain and ordinary meaning. See Meyer v. U.S. Fire Ins. Co., 582 N.W.2d 40, 41 (Wis. Ct. App. 1998). Words and phrases cannot be considered in isolation; rather, the court must consider the contract as a whole to provide each provision with the meaning intended by the parties. See Campion v. Montgomery Elevator Co., 493 N.W.2d 244, 249 (Wis. Ct. App. 1992). If this inquiry indicates that the contract is unambiguous, the court must give effect to the agreement as written. See Borchardt v. Wilk, 456 N.W.2d 653, 656 (Wis. Ct. App. 1990).

However, a contract contains ambiguities when "it is reasonably and fairly susceptible to more than one construction." Dieter v. Chrysler Corp., 610 N.W.2d 832, 836 (Wis. 2000). Generally, if a contract is ambiguous and the parties resort to extrinsic evidence to explain the agreement, construction of the document becomes a fact question. See Lakeshore Commercial Fin. Corp., 319 N.W.2d at 843. However, if the undisputed facts permit only a single inference, the court may resolve the contract's meaning without resort to a jury. To the extent ambiguities exist, a court construes them strongly against the party who drafted the contract. See Strong v. Shawano Canning Co., 109 N.W.2d 355, 357 (Wis. 1961). However, even when applying this latter rule, the court "must reject a construction resulting in unfair or unreasonable results." Borchardt, 456 N.W.2d at 657.

C.  Interpretation of the Contract

1.

We must address the meaning of the following provision contained in each of the agreements between Firstar and the Banks:

SYSTEMS MODIFICATION. Firstar may modify, amend or replace any Service or any element of its systems at any time when Firstar deems that such is appropriate or necessary. Firstar may terminate providing any Service upon [180/270/360] days' prior written notice to Customer and may terminate any Service immediately upon any action by any regulatory agency, legislative body or court having jurisdiction over Firstar or Customer which Firstar deems to have an adverse material effect on such Service or requires termination of such Service.

R.14, Ex.D.

The district court determined that this provision unambiguously permitted Firstar to terminate all of its services to the Banks upon proper notice. The Banks submit that Section 7 has a narrower meaning. First, they urge this court to interpret the phrase "any Service" to mean "one Service" or "single Service." Under the Banks' construction of the

contracts, Firstar could have terminated only one service without breaching the agreements. In the alternative, they suggest that Section 7 permitted Firstar to terminate some services, "but [only] to the extent that the basic purpose of the agreement is not clearly frustrated." Appellants' Br. at 18. Firstar's position tracks the rationale of the district court's opinion.

2.

Several considerations support the district court's interpretation of Section 7. Because the agreements do not define "any," we must assign the word its plain and ordinary meaning. In doing so, we may resort to a dictionary definition. See Coutts v. Wis. Ret. Bd., 547 N.W.2d 821, 826 (Wis. Ct. App. 1996). As Firstar aptly notes, definitions of "any" include "one or more," "every" and "all." See Webster's Third New International Dictionary 97 (1991). Inclusion of these definitions support the view that Section 7 permits the termination of "all Services."

Wisconsin law, which governs the contracts, lends further support to this interpretation of "any." In Coutts v. Wisconsin Retirement Board, 547 N.W.2d 821 (Wis. Ct. App. 1996), the Wisconsin court of appeals addressed the meaning of the phrase "any worker's compensation benefit payable." Coutts, 547 N.W.2d at 825. The court concluded that "'any' is generally understood to mean every." Id. at 826. Similarly, in State v. Timmerman, 542 N.W.2d 221, 224 (Wis. Ct. App. 1995), the Wisconsin court of appeals had to interpret a parole provision that permitted an inmate "the privilege of leaving the jail . . . for any of the following purposes . . . ." Timmerman, 542 N.W.2d at 224 (emphasis in original). A trial court had held that the provision permitted an inmate's release for only one of the purposes enumerated in the statute. See id. at 223. The appellate court rejected this position, noting that the legislature had selected "the broader word 'any'" as opposed to the word "one." Id. at 224. Through use of the word "any," the legislature vested the trial court with discretion to "grant release either for one or several of the purposes" set forth in the statute. See id. at 225.

The interpretations of "any" set forth in Coutts and Timmerman would not strip Section 7 of coherency. The Coutts and Timmerman definitions seem to reflect the parties' intentions to give Firstar some discretion in modifying the services it provided the Banks. Section 7 states:

Firstar may modify, amend or replace any Service or any element of its systems at any time when Firstar deems that such is appropriate or necessary. Firstar may terminate providing any Service upon [180/270/360] days' prior written notice to Customer and may terminate any Service immediately upon any action by any regulatory agency, legislative body or court having jurisdiction over Firstar or Customer which Firstar deems to have an adverse material effect on such service or requires termination of such Service.

R.14, Ex.D. Interpreting "any" to mean "all" would permit Firstar to modify every service in the event of technological improvements or a systems upgrade. At the same time, Section 7 indicates that the parties sought to provide Firstar with flexibility in the event regulators ordered it to halt operations. Under the Coutts and Timmerman understanding of "any," Firstar would retain this flexibility in the face of regulatory action.

Considering these factors, a reasonable person could conclude that the parties intended "any," as used in Section 7 of the agreements, to mean "all." Attaching this meaning to "any," Section 7 would have permitted Firstar's cessation of services to the Banks provided it gave them proper notice. Upon reviewing the record, it is evident that Firstar complied with the notice requirements set forth in all of the contracts. As such, under this reading of the agreements, Firstar could not be held liable for breach of contract; it complied with the terms of the agreements.

3.

The above interpretation, however, does not constitute the only plausible reading of the contracts. The meaning of a contract cannot be derived from words and phrases considered in isolation. To the contrary, the intention of the parties is

ascertained from a consideration of all of an agreement's provisions. When considering the contracts in their entirety, a reasonable person could conclude that Section 7 permits termination of some, but not all, services to the Banks.

The agreements do not contain a termination clause per se. When identifying events or conditions that would permit complete termination of the agreements, the parties use a precise set of words. For instance, Section 2 of each accord details a party's ability to terminate the contract. Specifically, this provision, entitled "Terms," states:

This Agreement may be terminated at the end of the term set forth above, provided that Customer gives Firstar at least *** days' prior written notice. . . . This Agreement may also be terminated by a non-defaulting party in the case of an event of default hereunder.

R.14, Ex.D. Similarly, a portion of Section 7 not in dispute in this case provides:

In the event Firstar terminates providing one of the "Core Services" . . . that is used by the Customer, and Firstar fails to replace such a Core Service, prior to termination of said Core Service, with a substitute product of comparable feature, function and pricing, Customer may terminate this Agreement without being in default . . . ./9

R.14, Ex.D. Thus, when identifying a parties' ability to terminate the contract, Firstar and the Banks use a precise set of words--"terminate this Agreement."

The location of the contested phrase, "may terminate providing any Service," arguably belies the notion that these words permit unilateral termination of the contracts. The phrase is located in the middle of Section 7--a provision entitled "Systems Modification." Ordinarily, "modification" means "the act or action of changing something without fundamentally altering it." Webster's Third New International Dictionary 1452 (1991). The word does not suggest the ability to terminate the agreements. Indeed, as we have noted earlier, at

other places in the contracts, Firstar and the Banks used precise phrases to indicate a party's ability to terminate the contract. By contrast, the phrase which Firstar contends permits it to terminate the agreement-- "Firstar may terminate providing any Service"--is far less precise than the language in Section 2. A reasonable person could conclude that it is incongruous that such imprecise language, buried in the middle of Section 7, would authorize the complete cessation of services to the Banks. The words "may terminate any Service" could be read plausibly to permit the termination of some, but not all, services.

Wisconsin case law does not contradict necessarily this interpretation of the agreements. Although Coutts and Timmerman suggest that "any" may mean "every" in certain contexts, they are not dispositive in construing the contracts before us. Coutts' discussion of "any" is perfunctory; the opinion dealt primarily with the meaning of the word "payable" as used in a statute. In addition, quoting Black's Law Dictionary, Timmerman recognized that "any" has a variety of meanings including: "some," "one or more," "an indefinite number," "either," "every," and "all." See Timmerman, 542 N.W.2d at 224. Thus, Timmerman implicitly recognized that "any" may mean "some" depending upon the context in which the word is used. Neither Coutts nor Timmerman compel necessarily the conclusion that "any" means "all" as used in these agreements.

Based on the foregoing, a reasonable person could conclude that the parties did not intend for the phrase "may terminate providing any Service" to permit the complete cessation of all services. In particular, the agreements use precise language to signal the parties' ability to terminate the contracts. This language was plainly absent from Section 7. Moreover, the title of Section 7--"Systems Modification"--may indicate plausibly that the parties designed this provision for a limited purpose--allowing Firstar to alter but not cease services./10 Under this construction of the agreements, Section 7 only authorizes Firstar to halt some, but not all, services.

4.

Although we conclude that these latter interpretations are plausible, we cannot accept the Banks' contention that "any" meant "one" in the context of these agreements. Under the Banks' reading, Firstar could only modify or terminate a single service during the life of the agreements. Limiting the word in this manner renders Section 7 nonsensical. For instance, Firstar would breach the agreement if it updated the data processing services on two occasions during the term of a contract. It is difficult to believe that the parties would intend for this provision to have such a circumscribed meaning. In their brief to this court, the Banks appear to concede this point. They stated that "[i]t is true, as noted by the District Court, that a reading of Section 7 reveals that the parties intended Section 7 to allow [Firstar] broad discretion in their provision of Services." Appellants' Br. at 19. Simply put, the parties did not intend for Section 7 to have such a limited meaning. As such, we reject the Banks' argument that Section 7 only allowed Firstar to terminate a single service during the life of the contracts.

5.

After considering the text of the agreements, we conclude that the contracts are susceptible to reasonable alternate interpretations thereby rendering them ambiguous. Although we cannot accept the proposition that Section 7 only permitted the termination of a single service, beyond that point, reasonable people could differ concerning the precise scope of the phrase "may terminate providing any Service." It is plausible to read this provision to permit the termination of all services. At the same time, the location of the phrase, along with other factors, would permit a reasonable person to conclude that Firstar only could terminate a range of services but not all services. Because a resort to extrinsic evidence is warranted to resolve these ambiguities, resolution of this case on summary judgment is inappropriate. Moreover, the trier of fact, not this court, must resolve the conflicting interpretations of the agreement. Because the contracts

are ambiguous, we remand the case to afford both parties the opportunity to submit extrinsic evidence to explain, but not contradict, the meaning of Section 7./11 See, e.g., Craigs, Inc. v. Gen. Elec. Capital Corp., 12 F.3d 686, 692 (7th Cir. 1993) (remanding to allow parties to submit extrinsic evidence concerning the meaning of an ambiguous contract).

Conclusion

Because Section 7 is susceptible to reasonable alternate interpretations, we conclude that the agreements are ambiguous thereby precluding summary judgment. Accordingly, we reverse the judgment of the district court and remand this case for further proceedings. The Banks may recover the costs of this appeal.

REVERSED and REMANDED

FOOTNOTES

/1 The Banks include: Burling Bank, Cambridge Bank of Lake Zurich, Community Bank-Elmhurst, Community Bank-Wheaton/ Glen Ellyn, Illinois State Bank of Lake in the Hills, Prairie Bank & Trust Company, Private Bank & Trust Company, Village Bank & Trust North Barrington, Northwest Suburban Bancorp, Inc. and National Bank of Commerce. An eleventh bank, Midwest Bank, voluntarily dismissed its suit against Firstar.

/2 Firstar Information Services was dissolved in 1998.

/3 This language comes from the agreement between Firstar and First Bank & Trust.
/4 The contracts with the various Banks vary with regard to the time period for notification.

/5 These terms are absent from the contracts of Cambridge Bank, Private Bank and Community Bank of Elmhurst.

/6 Although Firstar moved for judgment on the pleadings, the district court considered the motion to be one for summary judgment. Specifically, the Banks had filed a motion for summary judgment on the same legal issues as contained in Firstar's motion for judgment on the pleadings. As such, the district court concluded that Firstar's "motion is properly considered one for summary judgment." R.27 at 2.

/7 The two banks that brought claims under the

Illinois Consumer Fraud Act voluntarily dismissed those claims after the district court entered summary judgment for Firstar on the breach of contract claims.

/8 Each contract contains a choice of law provision that states "[t]his agreement shall be governed by the laws of the State of Wisconsin." R.14, Ex.D. As the parties do not dispute this provision, we shall follow its terms.

/9 As we previously noted, this provision is absent from the contracts of three of the Banks. See supra note 5.

/10 It would be premature for us to decide precisely how many services Firstar could terminate pursuant to Section 7. We note, however, that Wisconsin law recognizes that "[e]very contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of the parties." Wis. Natural Gas Co. v. Gabe's Constr. Co., 582 N.W.2d 118, 121 (Wis. Ct. App. 1998) (quoting Bozzacchi v. O'Malley, 566 N.W.2d 494, 495 (Wis. Ct. App. 1997)). Although the covenant does not override express terms of a contract, "obligations under those [express] terms must be performed subject to the implied covenant." Wis. Natural Gas Co., 582 N.W.2d at 121. Simply put, this covenant serves to guide construction of explicit terms of the agreement, particularly when gaps exist in the contract. See Baxter Healthcare Group Corp. v. OR Concepts, Inc., 69 F.3d 785 (7th Cir. 1995) (applying Illinois law). Thus, courts "use good faith as a protection device to approximate terms not actually contained in the contract." Market St. Assoc. Ltd. P'ship v. Frey, 21 F.3d 782, 786 (7th Cir. 1994).

/11 The Banks also sought resolution of whether Firstar's conduct, if constituting a breach of the agreements, would activate the limitation of remedies provision contained in several of the contracts. We do not address that issue at this time.